**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| JOSEPH GREENBERG, Derivatively on Behalf of RESOURCE CAPITAL CORP., | X : : | Case No. |
| Plaintiff, | : : : : | |
| v. | : : | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR |
| DAVID J. BRYANT, ELDRON C. BLACKWELL, DAVID E. BLOOM, STEPHEN J. KESSLER, MURRAY S. LEVIN, P. SHERILL NEFF, WALTER T. BEACH WILLIAM B. HART, GARY ICKOWICZ RICHARD L. FORE, STEPHANIE H. WIGGINS, JONATHAN Z. COHEN, EDWARD E. COHEN, RESOURCE AMERICA, INC., and RESOURCE CAPITAL MANAGER, INC., | : : : : : : : : : | VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT |
| Defendants, | : : | |
| -and- | : : | |
| RESOURCE CAPITAL CORP., a Maryland corporation, | : : : | |
| Nominal Defendant. | : : | |
| | X | DEMAND FOR JURY TRIAL |

## SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Resource Capital Corp. ("Resource Capital" or the "Company") against certain of its officers and directors for violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, and against related parties Resource Capital Manager, Inc. (the "Resource Manager") and Resource America, Inc. ("Resource America") for unjust enrichment. These wrongs have resulted in substantial damages to Resource Capital's reputation, goodwill, and standing in the business community.  Moreover, these actions have caused the Company to waste millions of dollars on improper management fees and exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      Resource Capital is a commercial real estate specialty finance company that is organized as a diversified real estate investment trust ("REIT"). The Company's investment strategy focuses on commercial real estate, commercial real estate-related assets and, to a lesser extent, residential real estate and commercial finance assets.  As a REIT, Resource Capital is required by law to pay at least 90% of its profits as dividends.  According to the Company's annual filings with the U.S. Securities and Exchange Commission (the "SEC"), Resource Capital's "objective is to provide [its] stockholders with total returns over time, including quarterly distributions and capital appreciation, while seeking to manage the risks associated with [the Company's] investment strategies."

3.      Resource Capital is externally managed by the Resource Manager an indirect wholly-owned subsidiary of Resource America, a specialized asset management company.  As the Company concedes, the management agreement between Resource Capital and the Resource Manager (the "Management Agreement") "was not negotiated at arm's-length," given that at the time the agreement was negotiated, Resource Capital's officers and two of its directors, defendants

Edward E. Cohen ("E. Cohen") and Jonathan Z. Cohen ("J. Cohen"), were also officers or directors of the Resource Manager and Resource America.  In fact, neither the Company nor the Resource Manager has any employees.  Rather, all of Resource Capital's and the Resource Manager's officers, portfolio managers, administrative personnel, and/or employees are all employees of Resource America.

4.      Defendants E. Cohen and J. Cohen are Resource America's largest stockholders, collectively beneficially owning approximately 30% of its shares.  Though defendants E. Cohen and J. Cohen recently retired from Resource Capital's Board of Directors (the "Board"), they continue to exercise undue control over the Company through their enormous Resource America stock holdings and through their appointment of the current Board members who are loyal and dependent on them.  Indeed, the Company concedes that Resource America and Resource Manager (which are both dominated by defendants E. Cohen and J. Cohen) have "significant discretion as to the implementation of [Resource Capital's] operating policies and investment strategies."

5.      As described in more detail below, defendants E. Cohen and J. Cohen, along with certain other defendants, engaged in a course of conduct designed to enrich Resource America through excessive and undeserved management fees.  First, the Board agreed to pay the Resource Manager a monthly base management fee equal to one-twelfth of the Company's equity, regardless of performance.  Second, for years the Board failed to disclose that one of the Company's mezzanine loan positions that was acquired in 2007 (the "Mezzanine Loan") was largely supported by a portfolio of luxury brand hotels located in or near Puerto Rico.  Third, for years while the Puerto Rican economy was collapsing and long after the Mezzanine Loan had ceased performing (in or about late 2012), the Board repeatedly caused or allowed the Company to improperly tout that "[a]ll of the Company's commercial real estate loans were performing."  The Individual Defendants wrongful course of conduct improperly inflated the Company's apparent equity from

about late 2012 through the first half of 2015, in turn improperly inflating the management fees the Company paid to the Resource Manager during that time, which averaged about $13.7 million per year.

6.      On August 4, 2015, after the stock market closed, Resource Capital issued a press release announcing its financial results for the quarter ended June 30, 2015.  After numerous improper statements concerning the Company's financial condition and loan portfolio, Resource Capital disclosed that it would incur a quarterly net loss of $31 million caused by the Company's recording of an allowance for a $41.1 million loan loss on the Mezzanine Loan.  As disclosed in the press release, the economic and credit disruptions in Puerto Rico caused the Company to determine that the Mezzanine Loan should have been fully reserved.  As a result of this disclosure, Resource Capital's stock plunged 14.66%, erasing over $68.4 million in market capitalization.  Had the Company timely recorded the loss in late 2012 when the Mezzanine Loan stopped performing, the nearly 15% decline in equity presumably would have similarly occurred then, and Resource Capital would have paid approximately $4.5 million less in management fees to Resource Manager from the fourth quarter of 2013 through the first quarter of 2015 as a result of the decreased equity.[1]

7.      To make matters worse, in 2014 and 2015 the Individual Defendants filed two materially misleading Proxies.  Both Proxies urged stockholders to vote to re-elect the directors, and the 2014 Proxy also urged stockholders to amend the Company's equity compensation plan to significantly increase the number of shares authorized for compensation packages.  As further detailed herein, these Proxies omitted material information concerning, among other things: (i) the Board's inadequate oversight concerning the Company's risks; (ii) the wrongfully inflated

---

[1] The calculation for the overpayment of management fees is based on information, belief, and reasonable assumptions to be later proven at trial.  Of note, Resource Capital calculates its base management fee on a monthly basis, whereas the Company's public filings only disclose quarterly fees.  Differences in the float between the two calculation methods are not possible to calculate using only the Company's publicly disclosed information.

management fees paid to affiliates at the Resource Manager; and (iii) the motivation behind increasing the authorized amounts for compensation stock grants.

8.      The Individual Defendants' actions have devastated Resource Capital, as is evident from the nearly 15% stock drop which wiped out over $68.4 million in market capitalization. More, as a direct result of the Individual Defendants' unlawful course of conduct, the Company and certain of its directors and officers are now the subject to a number of lawsuits, including at least one federal securities class action lawsuit filed in the United States District Court for the Southern District of New York, alleging violations of federal securities laws in connection with the Mezzanine Loan misstatements (the "Securities Class Action").  On October 5, 2016, the Court for the Securities Class Action denied defendants' motion to dismiss noting that: defendants' statements that "the Mezzanine Loan [was] 'performing' or 'current' without stating the qualification that it was a non-interest-paying troubled debt of a borrower in financial difficulty was, in the words of SEC Rule 10b-5 '…to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading….'"

## JURISDICTION AND VENUE

9.      Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemented jurisdiction over the remaining claims under 28 U.S.C. §1367.

10.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the

exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because: (i) Resource Capital maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Resource Capital, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

12.     Plaintiff Joseph Greenberg was a stockholder of Resource Capital at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Resource Capital stockholder.

**Nominal Defendant**

13.     Nominal Defendant Resource Capital is a Maryland corporation with principal executive offices located at 712 Fifth Avenue, 12th Floor, New York, New York.  The Company is a diversified REIT focused on commercial real estate, commercial real estate-related assets, and commercial financial assets in general.  Resource Capital is externally managed by defendant Resource Manager, which was an indirect wholly-owned subsidiary of defendant Resource America prior to September 2016 when Resource America was acquired by C-III Capital Partners LLC ("C-III").  In connection with the acquisition, C-III took over control of defendant Resource Manager with respect to the Management Agreement between Resource Manager and Resource

Capital.  As of March 10, 2016, the Company has no direct employees, except for those who work for Primary Capital Mortgage, LLC ("PCM"), Resource Capital's company acquired in 2013.

**Defendants**

14.     Defendant David J. Bryant ("Bryant") is Resource Capital's Chief Financial Officer ("CFO"), Senior Vice President, and Treasurer and has been since June 2006.  Defendant Bryant was also the Company's Chief Accounting Officer ("CAO") from 2006 to 2014.  Defendant Bryant is named as a defendant in the Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Bryant knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and/or public filings concerning: (i) the Company's increasing exposure to Puerto Rico's ongoing economic decline in connection with the Mezzanine Loan; (ii) related risks concerning Puerto Rico's economic decline in connection with the Mezzanine Loan; (iii) the quality and performance of the Company's loans; and (iv) the adequacy of the Company's internal controls.  Defendant Bryant also knowingly or recklessly failed to ensure the adequacy of the Company's internal controls and caused or allowed the Company to pay improperly inflated management fees to the Resource Manager.  Resource Capital paid defendant Bryant the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | All Other Compensation | Total |
|------|--------|-------|--------------|------------------------|-------|
| 2015 | $275,000 | $300,000 | $99,998 | - | $674,998 |
| 2014 | $275,000 | $265,000 | $99,996 | - | $639,996 |
| 2013 | $275,000 | $287,500 | $49,997 | $12,493 | $624,990 |
| 2012 | $275,000 | $200,000 | $399,996 | $49,994 | $924,990 |
| Total | | | | | $2,864,974 |

15.     Defendant Eldron C. Blackwell ("Blackwell") is Resource Capital's CAO and Vice President and has been since March 2014.  Defendant Blackwell is named as a defendant in the Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Blackwell knowingly, recklessly, or with gross negligence made improper

statements in the Company's press releases and/or public filings concerning: (i) the Company's increasing exposure to Puerto Rico's ongoing economic decline in connection with the Mezzanine Loan; (ii) related risks concerning Puerto Rico's economic decline in connection with the Mezzanine Loan; (iii) the quality and performance of the Company's loans; and (iv) the adequacy of the Company's internal controls. Defendant Blackwell also knowingly or recklessly failed to ensure the adequacy of the Company's internal controls and caused or allowed the Company to pay improperly inflated management fees to the Resource Manager.

16. Defendant David E. Bloom ("Bloom") is Resource Capital's Senior Vice President of Real Estate Investments and has been since 2005. Defendant Bloom is named as a defendant in the Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Bloom has also held positions at other Resource America affiliates. Defendant Bloom is Resource America's Senior Vice President and has been since September 2001. Defendant Bloom was Resource Capital Partners, Inc.'s President from 2002 to 2006. Defendant Bloom is Resource Innovation Office REIT, Inc.'s Senior Vice President and has been since June 2014. Defendant Bloom was Resource Properties, Inc.'s President from 2001 to 2002. Defendant Bloom is Resource Real Estate, Inc.'s President and a director has been since May 2004. Defendant Bloom is Resource Real Estate Opportunity REIT, Inc.'s Senior Vice President and has been since June 2009. Defendant Bloom is Resource Opportunity REIT II, Inc.'s Senior Vice President and has been since October 2012. Defendant Bloom is Resource Apartment REIT III, Inc.'s Senior Vice President and has been since July 2015. Defendant Bloom knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and/or public filings concerning: (i) the Company's increasing exposure to Puerto Rico's ongoing economic decline in connection with the Mezzanine Loan; (ii) related risks concerning Puerto Rico's economic decline in connection with the Mezzanine Loan; (iii) the quality and performance

- 7 -

of the Company's loans; and (iv) the adequacy of the Company's internal controls.  Defendant Bloom also knowingly or recklessly failed to ensure the adequacy of the Company's internal controls and caused or allowed the Company to pay improperly inflated management fees to the Resource Manager.  Resource Capital paid defendant Bloom the following compensation as an executive:

| Year | Stock Awards | Total |
|------|-------------|-------|
| 2015 | $174,999 | $174,999 |
| 2014 | $149,996 | $149,996 |
| 2013 | $299,997 | $299,997 |
| 2012 | $799,997 | $799,997 |
| Total | | $1,424,989 |

17.     Defendant Steven J. Kessler ("Kessler") is a Resource Capital director and has been since November 2009.  Defendant Kessler was also Resource Capital's Chairman of the Board from November 2009 to at least April 2016; Senior Vice President, Finance from September 2005 to November 2009; and CFO, CAO, and Treasurer from March 2005 to September 2005. Defendant Kessler was also a member of Resource Capital's Investment Committee from at least April 2012 to at least April 2016.  Defendant Kessler has also held positions at other Resource America affiliates.  Defendant Kessler was Resource America's Executive Vice President from 2005 to at least January 2011; CFO from 1997 to December 2009; and Senior Vice President from 1997 to 2005.  Defendant Kessler was a LEAF Asset Management, LLC director from August 2006 to at least May 2009.  Defendant Kessler was a LEAF Commercial Capital, Inc. director in at least November 2011.  Defendant Kessler knowingly or recklessly made improper statements in the Company's press releases and/or public filings concerning: (i) the Company's increasing exposure to Puerto Rico's ongoing economic decline in connection with the Mezzanine Loan; (ii) related risks concerning Puerto Rico's economic decline in connection with the Mezzanine Loan; (iii) the quality and performance of the Company's loans; and (iv) the adequacy of the Company's internal controls.  Defendant Kessler also knowingly or recklessly failed to ensure the

adequacy of the Company's internal controls and caused or allowed the Company to pay improperly inflated management fees to the Resource Manager.   Defendant Kessler also negligently violated section 14(a) of the Exchange Act by causing Resource Capital to make misleading statements in its 2014-2015 proxy statements.  Resource Capital paid defendant Kessler the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2015 | $347,923 | - | $347,923 |
| 2014 | $346,999 | - | $346,999 |
| 2013 | $368,649 | - | $368,649 |
| 2012 | $456,162 | $149,994 | $606,156 |
| Total | | | $1,669,727 |

18.     Defendant Murray S. Levin ("Levin") is a Resource Capital director and has been since March 2005.  Defendant Levin has also held positions at other Resource America affiliates. Defendant Levin was an Atlas Pipeline Partners GP, LLC director from 2001 to March 2005. Defendant Levin knowingly or recklessly made improper statements in the Company's press releases and/or public filings concerning: (i) the Company's increasing exposure to Puerto Rico's ongoing economic decline in connection with the Mezzanine Loan; (ii) related risks concerning Puerto Rico's economic decline in connection with the Mezzanine Loan; (iii) the quality and performance of the Company's loans; and (iv) the adequacy of the Company's internal controls. Defendant Levin also knowingly or recklessly failed to ensure the adequacy of the Company's internal controls and caused or allowed the Company to pay improperly inflated management fees to the Resource Manager.  Defendant Levin also negligently violated section 14(a) of the Exchange Act by causing Resource Capital to make misleading statements in its 2014-2015 proxy statements. Resource Capital paid defendant Levin the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2015 | $70,000 | $35,006 | $105,006 |
| 2014 | $70,000 | $34,996 | $104,996 |

| | | | |
|---|---|---|---|
| 2013 | $70,000 | $34,993 | $104,993 |
| 2012 | $52,500 | $22,495 | $74,995 |
| **Total** | | | **$389,990** |

19.     Defendant P. Sherrill Neff ("Neff") is a Resource Capital director and has been since March 2005.  Defendant Neff was also the Chair of Resource Capital's Audit Committee and a member of that committee from at least April 2012 to at least April 2016.  Defendant Neff has also held positions at other Resource America affiliates.  Defendant Neff was a Resource America director from 1998 to 2005.  Defendant Neff has also held positions at Cohen Family-operated companies.  Defendant Neff was a director of The Bancorp, Inc. from 1999 to 2002.  Defendant Neff knowingly or recklessly made improper statements in the Company's press releases and/or public filings concerning: (i) the Company's increasing exposure to Puerto Rico's ongoing economic decline in connection with the Mezzanine Loan; (ii) related risks concerning Puerto Rico's economic decline in connection with the Mezzanine Loan; (iii) the quality and performance of the Company's loans; and (iv) the adequacy of the Company's internal controls.  Defendant Neff also knowingly or recklessly failed to ensure the adequacy of the Company's internal controls and caused or allowed the Company to pay improperly inflated management fees to the Resource Manager.  Defendant Neff also negligently violated section 14(a) of the Exchange Act by causing Resource Capital to make misleading statements in its 2014-2015 proxy statements.  Resource Capital paid defendant Neff the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2015 | $80,000 | $40,001 | $120,001 |
| 2014 | $80,000 | $39,996 | $119,996 |
| 2013 | $80,000 | $39,999 | $119,999 |
| 2012 | $52,500 | $22,495 | $74,995 |
| **Total** | | | **$434,991** |

20.     Defendant Walter T. Beach ("Beach") is a Resource Capital director and has been since March 2005.  Defendant Beach was also a member of Resource Capital's Audit Committee

from at least April 2012 to at least April 2016 and a member of the Investment Committee from at least April 2012 to at least April 2016.  Defendant Beach has also held positions at Cohen Family-operated companies.  Defendant Beach is a director of The Bancorp, Inc. and has been since 1999. Defendant Beach was a director of Fintech, Inc. from November 2014 to July 2016.  Defendant Beach knowingly or recklessly made improper statements in the Company's press releases and/or public filings concerning: (i) the Company's increasing exposure to Puerto Rico's ongoing economic decline in connection with the Mezzanine Loan; (ii) related risks concerning Puerto Rico's economic decline in connection with the Mezzanine Loan; (iii) the quality and performance of the Company's loans; and (iv) the adequacy of the Company's internal controls.  Defendant Beach also knowingly or recklessly failed to ensure the adequacy of the Company's internal controls and caused or allowed the Company to pay improperly inflated management fees to the Resource Manager.  Defendant Beach also negligently violated section 14(a) of the Exchange Act by causing Resource Capital to make misleading statements in its 2014-2015 proxy statements. Resource Capital paid defendant Beach the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2015 | $180,000 | $40,001 | $220,001 |
| 2014 | $180,000 | $39,995 | $219,995 |
| 2013 | $180,000 | $39,999 | $219,999 |
| 2012 | $102,500 | $22,495 | $124,995 |
| Total | | | $784,990 |

21.     Defendant William B. Hart ("Hart") is a Resource Capital director and has been since March 2005.  Defendant Hart was also a member of Resource Capital's Audit Committee from at least April 2012 to at least April 2016.  Defendant Hart knowingly or recklessly made improper statements in the Company's press releases and/or public filings concerning: (i) the Company's increasing exposure to Puerto Rico's ongoing economic decline in connection with the Mezzanine Loan; (ii) related risks concerning Puerto Rico's economic decline in connection with

the Mezzanine Loan; (iii) the quality and performance of the Company's loans; and (iv) the adequacy of the Company's internal controls.  Defendant Hart also knowingly or recklessly failed to ensure the adequacy of the Company's internal controls and caused or allowed the Company to pay improperly inflated management fees to the Resource Manager.  Defendant Hart also negligently violated section 14(a) of the Exchange Act by causing Resource Capital to make misleading statements in its 2014-2015 proxy statements.  Resource Capital paid defendant Hart the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2015 | $75,000 | $35,006 | $110,006 |
| 2014 | $75,000 | $34,996 | $109,996 |
| 2013 | $75,000 | $34,994 | $109,994 |
| 2012 | $52,500 | $22,495 | $74,995 |
| Total | | | $404,991 |

22.     Defendant Gary Ickowicz ("Ickowicz") is a Resource Capital director and has been since February 2007.  Defendant Ickowicz was also a member of Resource Capital's Investment Committee from at least April 2012 to at least April 2016.  Defendant Ickowicz knowingly or recklessly made improper statements in the Company's press releases and/or public filings concerning: (i) the Company's increasing exposure to Puerto Rico's ongoing economic decline in connection with the Mezzanine Loan; (ii) related risks concerning Puerto Rico's economic decline in connection with the Mezzanine Loan; (iii) the quality and performance of the Company's loans; and (iv) the adequacy of the Company's internal controls.  Defendant Ickowicz also knowingly or recklessly failed to ensure the adequacy of the Company's internal controls and caused or allowed the Company to pay improperly inflated management fees to the Resource Manager.  Defendant Ickowicz also negligently violated section 14(a) of the Exchange Act by causing Resource Capital to make misleading statements in its 2014-2015 proxy statements.  Resource Capital paid defendant Ickowicz the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2015 | $165,000 | $34,998 | $199,998 |
| 2014 | $165,000 | $34,996 | $199,996 |
| 2013 | $165,000 | $34,992 | $199,992 |
| 2012 | $102,500 | $22,500 | $125,000 |
| Total | | | **$724,986** |

23.     Defendant Richard L. Fore ("Fore") is a Resource Capital director and has been since March 2013.   Defendant Fore was also a member of Resource Capital's Investment Committee from at least April 2014 to at least April 2016.  Defendant Fore knowingly or recklessly made improper statements in the Company's press releases and/or public filings concerning: (i) the Company's increasing exposure to Puerto Rico's ongoing economic decline in connection with the Mezzanine Loan; (ii) related risks concerning Puerto Rico's economic decline in connection with the Mezzanine Loan; (iii) the quality and performance of the Company's loans; and (iv) the adequacy of the Company's internal controls.  Defendant Fore also knowingly or recklessly failed to ensure the adequacy of the Company's internal controls and caused or allowed the Company to pay improperly inflated management fees to the Resource Manager.   Defendant Fore also negligently violated section 14(a) of the Exchange Act by causing Resource Capital to make misleading statements in its 2014-2015 proxy statements.  Resource Capital paid defendant Fore the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2015 | $165,000 | $35,013 | $200,013 |
| 2014 | $165,000 | $34,995 | $199,995 |
| 2013 | $109,306 | $34,995 | $144,301 |
| Total | | | **$544,309** |

24.     Defendant Stephanie H. Wiggins ("Wiggins") is a Resource Capital director and has been since June 2013.  Defendant Wiggins was also a member of Resource Capital's Audit Committee from at least April 2015 to at least April 2016.  Defendant Wiggins knowingly or recklessly made improper statements in the Company's press releases and/or public filings

concerning: (i) the Company's increasing exposure to Puerto Rico's ongoing economic decline in connection with the Mezzanine Loan; (ii) related risks concerning Puerto Rico's economic decline in connection with the Mezzanine Loan; (iii) the quality and performance of the Company's loans; and (iv) the adequacy of the Company's internal controls. Defendant Wiggins also knowingly or recklessly failed to ensure the adequacy of the Company's internal controls and caused or allowed the Company to pay improperly inflated management fees to the Resource Manager. Defendant Wiggins also negligently violated section 14(a) of the Exchange Act by causing Resource Capital to make misleading statements in its 2014-2015 proxy statements. Resource Capital paid defendant Wiggins the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2015 | $75,000 | $35,004 | $110,004 |
| 2014 | $70,000 | $34,999 | $104,999 |
| 2013 | $37,014 | $34,994 | $72,008 |
| Total | | | $287,011 |

25.    Defendant J. Cohen was Resource Capital's President, Chief Executive Officer ("CEO") and a director from March 2005 to September 2016. Defendant J. Cohen was also the Chair of Resource Capital's Investment Committee and a member of that committee from at least April 2012 to at least April 2016. Defendant J. Cohen is named as a defendant in the Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant J. Cohen has also held positions at other Resource America affiliates and is one of Resource America's two largest beneficial stock owners, collectively owning approximately 30% of the shares along with his father, defendant E. Cohen. Defendant J. Cohen was Resource America's CEO from 2004 to September 2016; President from 2003 to September 2016; a director from 2002 to September 2016; Chief Operating Officer from 2002 to 2004; Executive Vice President from 2001 to 2003; and Senior Vice President from 1999 to 2001. Defendant J. Cohen was a member of Ischus Capital Management, LLC's managing board from April 2004 to at least

April 2016. Defendant J. Cohen was a LEAF Asset Management, LLC director from August 2006 to at least March 2016. Defendant J. Cohen was a Leaf Financial Corporation director from January 2002 to at least March 2016. Defendant J. Cohen was RAIT Investment Trust's Vice Chairman from 2003 to 2006 and Secretary, Trustee, and a member of the Investment Committee from 1997 to 2006. Defendant J. Cohen was Resource Financial Fund Management, Inc.'s CEO from November 2004 to at least April 2016 and the Chairman of the board from September 2003 to at least April 2016. Defendant J. Cohen was Resource Financial Institutions Group, Inc.'s Chairman of the board from February 2005 to at least April 2016. Defendant J. Cohen was Resource Innovation Office REIT, Inc.'s Chairman of the board and a director from June 2014 to September 2016. Defendant J. Cohen was a Resource Real Estate, Inc. director from May 2004 to at least April 2016. Defendant J. Cohen was Resource Real Estate Management, Inc.'s Chairman of the board and a director from August 2007 to at least April 2016. Defendant J. Cohen was Resource Real Estate Opportunity REIT, Inc.'s Chairman of the board from October 2009 to September 2016 and a director from June 2009 to September 2016. Defendant J. Cohen was Resource Real Estate Opportunity REIT II, Inc.'s Chairman of the board from October 2012 to September 2016 and a director from September 2012 to September 2016. Defendant J. Cohen was Resource Apartment REIT III, Inc.'s Chairman of the board and a director from July 2015 to January 2016. Defendant J. Cohen is Atlas Energy GP, LLC's Executive Chairman and has been since January 2012. Defendant J. Cohen was Atlas Energy GP, LLC's Chairman of the board from February 2011 to January 2012 and Vice Chairman from December 2005 to February 2011. Defendant J. Cohen is Atlas Energy Group, LLC's Executive Chairman and has been since February 2015. Defendant J. Cohen was Atlas Energy Group, LLC's Vice Chairman from February 2012 to February 2015. Defendant J. Cohen was Atlas Energy Management, Inc.'s Vice Chairman from June 2006 to February 2011. Defendant J. Cohen was Atlas Energy Resources,

LLC's Vice Chairman from June 2006 to February 2011.  Defendant J. Cohen was Atlas Energy, Inc.'s Vice Chairman from September 2000 to February 2011.  Defendant J. Cohen is Atlas Growth Partners GP, LLC's Executive Vice Chairman and has been since 2013.  Defendant J. Cohen was Atlas Pipeline Partners GP, LLC's Executive Vice Chairman of the managing board from 1999 to February 2015.  Defendant J. Cohen is Atlas Resource Partners, LP's Executive Vice Chairman and has been since August 2015.  Defendant J. Cohen is Atlas Resource Partners GP, LLC's Executive Vice Chairman and has been since February 2013.  Defendant J. Cohen knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and/or public filings concerning: (i) the Company's increasing exposure to Puerto Rico's ongoing economic decline in connection with the Mezzanine Loan; (ii) related risks concerning Puerto Rico's economic decline in connection with the Mezzanine Loan; (iii) the quality and performance of the Company's loans; and (iv) the adequacy of the Company's internal controls.  Defendant J. Cohen also knowingly or recklessly failed to ensure the adequacy of the Company's internal controls and caused or allowed the Company to pay improperly inflated management fees to the Resource Manager.  Defendant J. Cohen also negligently violated section 14(a) of the Exchange Act by causing Resource Capital to make misleading statements in its 2014-2015 proxy statements.  Resource Capital paid defendant J. Cohen the following compensation as an executive:

| Year | Stock Awards | Total |
|------|-------------|-------|
| 2015 | $199,993 | $ 199,993 |
| 2014 | $1,999,997 | $1,999,997 |
| 2013 | $1,249,998 | $1,249,998 |
| 2012 | $2,750,000 | $2,750,000 |
| **Total** | | **$6,199,988** |

26.     Defendant E. Cohen was a Resource Capital director from March 2005 to September 2016 and Resource Capital's Chairman of the Board from March 2005 to November 2009.  Defendant E. Cohen has also held positions at other Resource America affiliates and is one

of Resource America's two largest beneficial stock owners, collectively owning approximately 30% of the shares along with his son, defendant J. Cohen.  Defendant E. Cohen was Resource America's Chairman of the board from 1990 to September 2016; a director from 1988 to September 2016; CEO from 1988 to 2004; and President from 2000 to 2003.  Defendant E. Cohen is Atlas Energy Group, LLC's CEO and a director and has been since February 2012.  Defendant E. Cohen was Atlas Energy Group, LLC's President from February 2015 to April 2015 and Chairman of the board from February 2012 to February 2015.  Defendant E. Cohen was Atlas Energy Management, Inc.'s CEO and Chairman of the board from June 2006 to February 2011.  Defendant E. Cohen was Atlas Energy Resources, LLC's CEO and Chairman of the board from June 2006 to February 2011.  Defendant E. Cohen was Atlas Energy, Inc.'s CEO and Chairman of the board from 2000 to February 2011 and President from September 2000 to October 2009.  Defendant E. Cohen is Atlas Growth Partners GP, LLC's CEO and Chairman of the board and has been since 2013. Defendant E. Cohen was Atlas Pipeline Partners GP, LLC's Executive Chair of the managing board from 1999 to February 2015 and CEO from 1999 to January 2009.  Defendant E. Cohen is Atlas Resource Partners, LP's Executive Chairman and has been since August 2015.  Defendant E. Cohen is Atlas Resource Partners GP, LLC's Executive Chairman and has been since August 2015. Defendant E. Cohen knowingly or recklessly made improper statements in the Company's press releases and/or public filings concerning: (i) the Company's increasing exposure to Puerto Rico's ongoing economic decline in connection with the Mezzanine Loan; (ii) related risks concerning Puerto Rico's economic decline in connection with the Mezzanine Loan; (iii) the quality and performance of the Company's loans; and (iv) the adequacy of the Company's internal controls. Defendant E. Cohen also knowingly or recklessly failed to ensure the adequacy of the Company's internal controls and caused or allowed the Company to pay improperly inflated management fees to the Resource Manager.  Defendant E. Cohen also negligently violated section 14(a) of the

Exchange Act by causing Resource Capital to make misleading statements in its 2014-2015 proxy statements.  Resource Capital paid defendant E. Cohen the following compensation as a director:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|----------------------------------------|------------------------|-------|
| 2014 | $350,000 | $1,000,000 | $2,229,600 | $700,000 | $371,819 | $4,651,419 |
| 2013 | $350,000 | — | $1,975,500 | $420,000 | $272,991 | $3,018,491 |
| 2012 | $98,577 | $1,000,000 | $3,498,000 | $302,500 | $206,097 | $5,105,174 |
| Total | | | | | | $12,775,084 |

27.     Defendant Resource America is a Delaware corporation with principal executive offices located at One Crescent Drive, Suite 203 Navy Yard Corporate Center, Philadelphia, Pennsylvania.  Defendant Resource America is an asset management company that specializes in real estate and credit investments.  Prior to its acquisition by C-III in September 2016, defendant Resource America was the parent company of Resource Capital through its indirect wholly-owned subsidiary, defendant Resource Manager.  In connection with the acquisition, defendant Resource America is now a wholly-owned subsidiary of C-III and does not exercise control over defendant Resource Manager.

28.     Defendant Resource Manager is a Delaware corporation.  Defendant Resource Manager is responsible for the investment activities, day-to-day operations, and asset management of Resource Capital.  Prior to the September 2016 acquisition of Resource America, defendant Resource Manager was an indirect wholly-owned subsidiary of defendant Resource America.  In connection with the acquisition, C-III assumed control of defendant Resource Manager with respect to the Management Agreement.

29.     The defendants identified in ¶¶14-16, 25 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶17-26 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶19-21, 24 are referred to herein as the "Audit

Committee Defendants."  Collectively, the defendants identified in ¶¶14-26 are referred to herein as the "Individual Defendants."

<u>**DUTIES OF THE INDIVIDUAL DEFENDANTS**</u>

**Fiduciary Duties**

30.     By reason of their positions as officers, directors, and/or fiduciaries of Resource Capital and because of their ability to control the business and corporate affairs of Resource Capital, the Individual Defendants owed and owe Resource Capital and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Resource Capital in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Resource Capital and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

31.     Each officer and director of the Company owes to Resource Capital and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**Additional Duties of the Audit Committee Defendants**

32.     In addition to the general duties discussed above, under the Company's Charter in effect since at least 2006, the Audit Committee Defendants, defendants Beach, Hart, Neff, and Wiggins, owed specific duties to Resource Capital to review and approve the Company's earnings press releases, guidance, and quarterly and annual financial statements.  The Audit Committee's

Charter provides, in relevant part, that the Audit Committee Defendants were and are required to assist the Board in fulfilling its oversight duties and in this capacity "[s]hall monitor the integrity and ensure the transparency of the Company's financial reporting process and systems of internal controls regarding finance, accounting and regulatory compliance."   The Audit Committee was also specifically required to:

> Review significant accounting and reporting issues and understand their impact on the financial statements.  These issues include:
>
> - Complex or unusual transactions and highly judgmental areas
>
> - Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles
>
> - The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company
>
> *   *   *
>
> Review disclosures made by CEO and CFO during the Forms 10-K and 10-Q certification process about significant deficiencies, if any, in the design or operation of internal controls or any fraud that involves management or other employees who have a significant role in the Company's internal controls.
>
> Review earnings press releases (particularly use of "pro-forma," or "adjusted" non-[generally accepted accounting principles ("GAAP")] information), as well as financial information and earnings guidance, if any, provided to analysts and rating agencies.  This review may be general (i.e., the types of information to be disclosed and the type of presentations to be made).  The Audit Committee Chairman and the independent auditors should each indicate their approval to management prior to the issuance of earnings press releases. The Audit Committee Chairman and the external auditors will confer, as necessary, prior to providing such approval.
>
> *   *   *
>
> Analyze any internal control deficiencies, management or employee fraud identified by the CEO/CFO certification process or by the Disclosure Committee.

**Breaches of Duties**

33.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its stockholders the fiduciary duty of loyalty and good faith

- 20 -

and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Resource Capital, the absence of good faith on their part, and/or a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of Resource Capital's Board.

34.    The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to repeatedly issue misleading statements concerning the Company's loan quality and performance.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action.  As a result, Resource Capital has expended, and will continue to expend, significant sums of money.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

35.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

36.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing

public, including stockholders of Resource Capital, regarding the Individual Defendants' management of Resource Capital's operations and risk exposure; (ii) pay excessive management fees to the Resource Manager for years; and (iii) enhance the Individual Defendants' executive and directorial positions at Resource Capital and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

37.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements and pay excessive management fees to the Resource Manager.

38.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

39.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

40.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND OF RESOURCE CAPITAL AND THE MANAGEMENT AGREEMENT

41.     Resource Capital is a REIT that focuses on commercial real estate, commercial real estate related assets, and, to a lesser extent, commercial finance assets.  As a REIT, Resource Capital is required by law to pay at least 90% of its profits as dividends.

42.     Pursuant to the Management Agreement, the Company is managed by the Resource Manager, a subsidiary of Resource America.  Resource America provides Resource Capital and the Resource Manager with all employees and officers, and neither Resource Capital nor the Resource Manager have any employees or officers of their own.  As a result, as Resource Capital concedes in its SEC filings, Resource America and the Resource Manager have "significant discretion as to the implementation of [Resource Capital's] operating policies and investment strategies."

43.     The Company is largely controlled by two of Resource Capital's former Board members, defendants E. Cohen and J. Cohen.  These defendants are Resource America's largest stockholders, collectively beneficially owning approximately 30% of Resource America's outstanding shares.

44.     The Management Agreement, which was not negotiated at arm's-length and directly benefits defendants E. Cohen and J. Cohen as Resource America's largest stockholders, provides that Resource Capital "must pay the [Resource] Manager [a base management fee equal to one-twelfth of the Company's equity], *regardless of the performance* of [the Company's] portfolio." To make matters worse, as the Company admits, termination of the Management Agreement "is difficult and could be costly."  Indeed, pursuant to the Management Agreement, the Company can only terminate the agreement "without cause only annually upon the affirmative vote of at least two-thirds of [Resource Capital's] independent directors or by a vote of the holders of at least a majority of [the Company's] outstanding common stock, based upon unsatisfactory performance

by the [Resource] Manager that is materially detrimental to [the Company] or a determination that the management fee payable to the [Resource] Manager is not fair."  If the Company terminates without showing cause, Resource Capital must pay the Resource Manager a staggering termination fee equal to four times the sum of the average annual base management fee and the average annual incentive compensation earned by it during the two twelve-month periods immediately preceding the date of termination.

## BACKGROUND OF THE MEZZANINE LOAN

45.     In 2007, the Company acquired the Mezzanine Loan, which was backed by a portfolio of thirteen luxury hotels, three of which were located in Puerto Rico, including the El San Juan Hotel & Casino, the El Conquistador Golf Resort & Casino, and the Candado Plaza Hotel & Casino.  This portfolio backed $742.5 million of debt securitized through the Wachovia Bank Commercial Mortgage Trust, 2007-WHALE8 (the "2007-WHALE8 Trust").

46.     The Company's Annual Reports on Forms 10-K, which were each signed by every member of the Board, have repeatedly acknowledged that commercial real estate mezzanine loans may be substantially negatively affected by the economic conditions surrounding the location of the property.  Specifically, for years the Company's Forms 10-K have disclosed the inherent risk that "[i]f the net operating income of the property is reduced, the borrower's ability to repay the loan may be impaired," and further warned that the net operating income of an income producing property, such as those in the Mezzanine Loan, can be negatively affected by, among other things:

- "property location and condition";

- "changes in national, regional or local economic conditions and/or the conditions of specific industry segments in which [the Company's] lessees may operate";

- "declines in regional or local real estate values"; and

- "the availability of debt or equity financing."

47.     Given the above, the Individual Defendants knew or should have known that the strength of Puerto Rico's economy was highly material to the quality of the Mezzanine Loan, which was secured by properties within Puerto Rico.

## PUERTO RICO'S FAILING ECONOMY AND DEBT CRISIS

48.     In or about 2006, Puerto Rico entered a recession.  In fact, the Commonwealth's debt has risen since 2000, reaching 100% of gross national product by the end of fiscal year 2014. The Commonwealth's fiscal crisis was well-known by no later than 2013 when numerous sources first began highlighting Puerto Rico's major financial struggles.

49.     On August 26, 2013, the investing periodical *Barron's* published a cover story titled "Troubling Winds - Puerto Rico's huge debt could overwhelm attempts to revive its economy. Bond investors, beware."  The article noted that Puerto Rico was shackled with nearly $70 billion in total debt, which was severely disproportionate to normative measures of Puerto Rico's financial health, including factors such as population, gross domestic product ("GDP"), and personal income.  In fact, as compared to the individual states, Puerto Rico's massive debt ranked third largest debt among all the states, behind only California and New York.  Importantly, on a per capita basis, Puerto Ricans each carried a debt burden of $14,324, or ten times higher than the average of the fifty states and more than five times larger than the state with the highest debt burden, California.   As a result, by August 2013, Puerto Rico's general-obligation bonds predictably received the lowest investment grade ratings available from both Standard & Poor's and Moody's.  Both agencies also held negative outlooks on the Commonwealth's credit rating, denoting the potential that its debt could soon get downgraded to "junk."  In addition, the article noted that "[a] closely watched index of economic activity compiled by the Puerto Rico Government Development Bank, shows a year-over-year decline of 4.5% in June [2013] …

reflect[ing that] gasoline consumption, payroll employment, electricity generation, and cement sales, has a high correlation with GDP."

50.     The following month, on September 17, 2013, *Kiplinger* published an article titled "Beware Puerto Rican Bonds Hiding in Your Portfolio."  The article further exposed Puerto Rico's financial crisis and overwhelming debt, noting that the Commonwealth's GDP declined by 5% in July 2013 compared to the previous year, which was the fastest rate of decline for the Puerto Rican economy in forty-one months.  The article also noted that between May 1, 2013 and September 17, 2013, the Standard & Poor's Puerto Rico Municipal Bond index plunged by a staggering 19% and numerous funds with heavy Puerto Rican bond investments lost substantial value over the previous three months, including eight Oppenheimer funds which lost between 11% and 15%, virtually wiping out the previous three years of positive returns.

51.     On October 9, 2013, numerous media sources reported that the Secretary of the Commonwealth of Massachusetts, William Galvin, had launched an investigation into sales of Puerto Rico's bonds to Massachusetts residents.  Noting that "everyone knows there is a problem with Puerto Rican bonds," Mr. Gavin expressed concern that investors were not adequately notified by fund managers of the extent of investing exposure to Puerto Rico.

52.     Over the next several months and continuing to the present, Puerto Rico's economy continued to decline while the Commonwealth struggled under its crushing debt crisis.  By February 2014, all three major credit rating agencies downgraded Puerto Rico's debt to "junk" status.  At about the same time, certain funds with heavy investments in Puerto Rican bonds began prominently disclosing their increased commensurate risks.  For example, a heavily Puerto Rican bond-weighted Oppenheimer fund amended its disclosures to state that "[i]f the economic situation in Puerto Rico persists or worsens, the volatility, liquidity, credit quality and performance of the Fund could be adversely affected."

53.     Through early January 2016, the Standard & Poor's Puerto Rico Municipal Bond index hovered at an approximate 15% decline as compared to February 2014 when it was first declared to be junk.  Then on January 4, 2016, Puerto Rico defaulted on $174 million of debt payments in order to pay the Commonwealth's general obligation to bondholders.  As a result, the Puerto Rican government was forced to put its other bonds into default and further risk additional debt defaults.  As a result, Standard & Poor's downgraded "the infrastructure authority's rating from CC to D," noting Puerto Rico's "default or … breach of an imputed promise" which signaled potential bankruptcy filing "or the taking of similar action … where default on an obligation is a virtual certainty."

### RESOURCE CAPITAL'S EXPOSURE TO PUERTO RICO INCREASES AS THE PUERTO RICAN ECONOMY CONTINUES TO COLLAPSE

54.     Predictably, as Puerto Rico's economy declined and its debt crisis ballooned, the 2007-WHALE8 Trust (which was largely backed by Puerto Rican hotels) suffered tremendously.  For example, in August 2012, two separate classes of the 2007-WHALE8 Trust were downgraded by Moody's to ratings that "are judged to be speculative of poor standing and are subject to very high credit risk."

55.     By September 2012, The Blackstone Group ("Blackstone"), the owner of the hotels within the 2007-WHALE8 Trust portfolio, was unable to meet its payment obligations to its specialty servicer and thus would be forced to sell some of the hotels before March 24, 2014.  Thus, the Mezzanine Loan ceased "performing" by any reasonable measure.

56.     On or about May 1, 2014, just a few weeks before the forced sell date, Fitch Ratings downgraded the 2007-WHALE8 Trust noting "[e]xceptionally high levels of credit risk" in which "[d]efault appears imminent or inevitable."

57.     As properties from the portfolio were sold off in order to repay principal, Resource Capital's Mezzanine Loan became increasingly riskier due to its increasing over-concentration in Puerto Rican hotels and significant dependency on the Commonwealth's economy.

**THE INDIVIDUAL DEFENDANTS REPEATEDLY MISREPRESENT RESOURCE CAPITAL'S INCREASING EXPOSURE TO PUERTO RICO AND INCREASING COMMENSURATE RISKS**

58.     Throughout the above timeframe, while Puerto Rico's economy continued to decline and face economic crisis, the Individual Defendants repeatedly made misleading statements and/or omitted material information concerning the Company's exposure to the Puerto Rican economy in order to inflate the value of the Mezzanine Loan and continue receiving bloated fees pursuant to the Management Agreement.   Specifically, as detailed below, the Individual Defendants utterly failed to disclose: (i) the risks that Resource Capital had become subjected to in connection with the Company's investment in the Mezzanine Loan; (ii) that the Mezzanine Loan ceased performing in late 2012; or (iii) the fact that the Mezzanine Loan was significantly backed by properties located in Puerto Rico. The Individual Defendants also woefully misrepresented the adequacy of Resource Capital's disclosure controls.

59.     Resource Capital held an earnings conference call with analysts and investors on March 5, 2013, half a year after: (i) Blackstone entered into a forbearance agreement with respect to the 2007-WHALE8 Trust and stopped paying Resource Capital cash income from the loan; and (ii) Moody's downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations" and noted the Trust was "speculative of poor standing and [] subject to very high credit risk."   During the call, the Individual Defendants failed to disclose the Mezzanine Loan's heavy reliance on the Puerto Rican economy or the increasing commensurate risk.  In fact, defendant J. Cohen brazenly boasted that all of the Company's "outstanding" real estate loans are performing and expect continued improvement stating:

Our credit quality is stable and improving and other than the legacy loans we sold in our syndicated bank loan facility, we feel like the credit environment for us is excellent. We took a modest provision on real estate loans in fourth quarter of $400,000.

However, *all 43 of our outstanding real estate loans are performing and we see a trend of improving property performance underlying these loans* beginning in 2011 through the year-end 2012 and continuing into 2013. That is, our real estate loss is shrinking.

\* \* \*

Our liquidity remains excellent. We had approximately $180 million of cash including $94 million of unrestricted cash as of December 31, even after making considerable investment during the quarter. Stay tuned for more investments.

*Our portfolio of real estate loans continued to perform well*. During 2012, we have grown our real estate loan portfolio by over $175 million. We expect this trend to continue as Dave Bloom and his real estate team continue to find out good opportunities to lend money against good real estate. We have generally strived to grow our origination channel and we believe that the investments we have made in our team and systems will start to pay off or have started to pay off and will continue to start to pay off.

60.     On March 18, 2013, Resource Capital filed with the SEC its Annual Report on Form 10-K for the fiscal year ended December 31, 2012 (the "2012 Form 10-K"). The 2012 Form 10-K was signed by defendant J. Cohen as CEO and President, and by defendant directors Kessler, J. Cohen, Beach, E. Cohen, Hart, Ickowicz, Levin, Neff, and Bryant. The 2012 Form 10-K admitted that local geographical conditions could negatively impact the performance of the Company's investments but utterly omitted any information concerning the Company's exposure to the Puerto Rican economic crisis. In fact, the 2012 Form 10-K never once mentioned Puerto Rico, and instead contained the following chart which excluded any exposure to Puerto Rico yet purportedly "describe[d] the loan type, property type and the geographic breakdown of [the Company's] commercial real estate loan portfolio":





61.     The 2012 Form 10-K also materially misrepresented that "all of [the Company's] commercial real estate loans were performing as of December 31, 2012," despite: (i) the forbearance agreement recently entered into by Blackstone; (ii) the fact that the Company stopped receiving cash income from the loan in September 2012 as interest merely accrued; and (iii) the fact that Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations."

62.     The 2012 Form 10-K further improperly touted that the Company properly maintains an allowance for loan losses and timely reports loan impairments, while failing to disclose the likely impairment relating to the Mezzanine Loan stating:

*Allowance for Loan Losses*

We maintain an allowance for loan losses. Loans held for investment are first individually evaluated for impairment, and then evaluated as a homogeneous pool

as loans with substantially similar characteristics for impairment. We perform the reviews at least quarterly.

We consider an individual loan to be impaired when, based on current information and events, management believes it is probable that we will be unable to collect all amounts due according to the contractual terms of the loan agreement. When a loan is impaired, we increase the allowance for loan losses by the amount of the excess of the amortized cost basis of the loan over its fair value. Fair value may be determined based on the present value of estimated cash flows; on market price, if available; or the fair value of the collateral less estimated disposition costs.  When we consider a loan, or a portion thereof, uncollectible and pursuit of the collection is not warranted, we will record a charge-off or write-down of the loan against the allowance for credit losses.

63.     Finally, the 2012 Form 10-K, which was accompanied by Sarbanes-Oxley Act of 2002 ("SOX") Certifications signed by defendants J. Cohen and Bryant, misled investors with respect to the Company's then- existing internal controls. Specifically, the 2012 Form 10-K improperly averred that the 2012 Form 10-K was not misleading and that the Company had adequate internal controls to ensure proper disclosure of material information stating:

**<u>Disclosure Controls and Procedures</u>**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our Securities Exchange Act of 1934 reports is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and our Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

Under the supervision of our Chief Executive Officer and Chief Financial Officer, we have carried out an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective at the reasonable assurance level.

\*   \*   \*

1.   I have reviewed this report on Form 10-K for the year ended December 31, 2012 of Resource Capital, Corp.;

2.   ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a.   ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;***

   b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board

of directors (or persons performing the equivalent functions):

a.   ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

b.   ***any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***

64.   On May 8, 2013, Resource Capital held an earnings conference call with analysts and investors to discuss the Company's first quarter 2013 financial performance. During the call, defendants J. Cohen and Bloom again improperly assured investors that the Company's entire real estate loan portfolio continued to perform well with expected continued increasing performance. Specifically, defendants J. Cohen and Bloom stated:

[Defendant J. Cohen:] ***Our portfolio of real estate loans continue to perform well***. During the last 12 months, we have grown our real estate loan portfolio by over $223 million on a gross origination basis. We expect this trend to continue as our real estate debt team continues to find good opportunities to lend money against good real estate. We have greatly strived to grow our origination channel and we believe the investments we have made in our team and systems will start to pay off.

\* \* \*

[Defendant Bloom:] …We note ***improving metrics across all asset classes with the majority of the properties securing our loans realizing improved cash flow year-over-year and continuing to trend in an upward direction***. In addition, we are pleased to see that the majority of the asset specific business plans across the portfolio are well on track and progressing towards the realization of borrowers' plans for value creation and ***the entire portfolio remains performing*** with no defaults.

65.   On May 10, 2013, Resource Capital filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended March 31, 2013 (the "May 10, 2013 Form 10-Q"). The May 10, 2013 Form 10-Q, which was signed by defendants J. Cohen and Bryant on behalf of themselves and the Company, again failed to disclose the Company's Puerto Rican investments or the already-materialized facts arising from Resource Capital's exposure to Puerto Rico within its commercial

real estate loan portfolio. Specifically, the May 10, 2013 Form 10-Q, which incorporated the "Risk Factors" disclosed in  the 2012 Form 10-K, stated that "[a]ll of the Company's commercial real estate loans were performing as of March 31, 2013 and December 31, 2012."  The May 10, 2013 Form 10-Q further misled investors with respect to the Company's then-existing internal controls through SOX certifications  signed by defendants J. Cohen and Bryant, which materially misrepresented that:

1.  I have reviewed this report on Form 10-Q for the quarter ended March 31, 2013 of Resource Capital, Corp.;

2.  ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.  ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***;

b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the

effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.   ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

b.   ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.

66.   On August 7, 2013, Resource Capital held an earnings conference call with analysts and investors to discuss the Company's second quarter 2013 financial performance.

67.   During the call, defendant Bloom stated:

Credit across the portfolio continues to trend in a positive direction with improving metrics across all asset classes. The majority of the properties securing our loans are continuing to realize improved cash flow and we are seeing borrowers' plans for value creation on or ahead of budget. Once again I am pleased to report that ***the entire portfolio is performing with no defaults***.

68.   During the call, defendant Bryant stated:

…Overall real estate credit has been excellent. And to reiterate Jonathan's point, I characterize our bank loan portfolio credit as improving.

Five bank loans totaling $12.6 million are delinquent out of a total portfolio of $1.1 billion. And ***remarkably, all of our 49 real estate loans are current and performing***.

69.   On August 9, 2013, Resource Capital filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended June 30, 2013, signed by defendants J. Cohen and Bryant on

behalf of themselves and the Company (the "August 9, 2013 Form 10-Q").  As with the previous Forms 10-Q, the August 9, 2013 Form 10-Q incorporated the "Risk Factors" disclosed in  the 2012 Form 10-K.  The August 9, 2013 Form 10-Q again improperly stated that "[a]ll of the Company's commercial real estate loans were performing," this time "as of June 30, 2013 and December 31, 2012," and again failed to disclose the Company's Puerto Rican investments or the already-materialized facts arising from Resource Capital's exposure to Puerto Rico within its commercial real estate loan portfolio. In addition, the August 9, 2013 Form 10-Q also misrepresented Resource Capital's mezzanine loan  portfolio as not containing any troubled-debt restructurings as of June 30, 2013, including with respect to the Mezzanine Loan stating:

*Troubled-Debt Restructurings*

The following tables show troubled-debt restructurings in the Company's  loan portfolio (in thousands):

|  | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| **Three Months Ended June 30, 2013:** | | | |
| Whole loans | — | $ — | $ — |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Loans receivable - related party | — | — | — |
| Total loans | — | $ — | $ — |
| | | | |
| **Three Months Ended June 30, 2012:** | | | |
| Whole loans | — | $ — | $ — |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Loans receivable | — | — | — |
| Loans receivable - related party | — | — | — |
| Total loans | — | $ — | $ — |
| **Six Months Ended June 30, 2013:** | | | |
| Whole loans | 2 | $ 56,328 | $ 56,328 |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Loans receivable - related party | 1 | 6,592 | 6,592 |
| Total loans | 3 | $ 62,920 | $ 62,920 |
| | | | |
| **Six Months Ended June 30, 2012:** | | | |
| Whole loans | 3 | $ 92,912 | $ 76,597 |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Loans receivable | — | — | — |
| Loans receivable - related party | 1 | 7,797 | 7,797 |
| Total loans | 4 | $ 100,709 | $ 84,394 |

As of June 30, 2013 and December 31, 2012, there were no troubled-debt restructurings that subsequently defaulted.

70.     Finally, the August 9, 2013 Form 10-Q continued to mislead investors with respect to the Company's then-existing internal controls through SOX certifications signed by defendants J. Cohen and Bryant stating:

1.     I have reviewed this report on Form 10-Q for the quarter ended June 30, 2013 of Resource Capital Corp.;

2.     ***Based on my knowledge, this report does not contain any untrue statement***

*of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;*

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a.    *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;*

   b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a.    *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting*

>    *which are reasonably likely to adversely affect the registrant's
>    ability to record, process, summarize and report financial
>    information; and*

> b.   *Any fraud, whether or not material, that involves management
>      or other employees who have a significant role in the registrant's
>      internal control over financial reporting.*

71.   On November 6, 2013, Resource Capital held an earnings conference call with analysts and investors to discuss the Company's third quarter 2013 financial performance. The conference call took place: (i) one month after the Secretary of the Commonwealth of Massachusetts launched an investigation into investment funds tied to Puerto Rican bonds and expressed concern that investors were not adequately notified of the extent of investing exposure to Puerto Rico; and (ii) a few months after multiple news sources published detailed articles concerning Puerto Rico's crippling debt, economic crisis, and plummeting Municipal Bond index. During the call, the Individual Defendants again failed to disclose the Company's exposure to Puerto Rico's failing economy. To make matters worse, defendant Bloom reiterated previous misrepresentations that the Company's entire portfolio was performing with no defaults, while defendant Bryant further touted that all of the Company's real estate loans were "remarkably" current and performing. Specifically, defendants Bloom and Bryant stated:

> [Defendant Bloom:] We are improving metrics across all asset classes with the majority of the property securing our loans realizing improved cash flow on a year-over-year basis and continuing to trend in upward direction. In addition, we are pleased to see that *the majority of the asset specific plans across the portfolio are well on track and progressing towards realization ultimately of the borrowers' plans for value creation and the entire portfolio remains performing with no defaults*. We are *very particular about markets in which we lend, sponsor quality and asset*- specific business plans and the resilience of the assets I just described is a daily  reminder that validates our keen focus on credit first approach to our business.

> \* \* \*

> [Defendant Bryant:] Overall, real estate credit has been excellent, and I characterize the bank loan portfolio credit as very benign. Three bank loans totaling $3.6 million are  delinquent out of a portfolio of approximately $940

million. And *remarkably, all of our real estate loans are current and performing*.

72. On November 12, 2013, Resource Capital filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended September 30, 2013, signed by defendants J. Cohen and Bryant on behalf of themselves and the Company (the "November 12, 2013 Form 10-Q"). The November 12, 2013 Form 10-Q, which incorporated the "Risk Factors" disclosed in the 2012 Form 10-K, again improperly failed to disclose the Company's exposure to the Puerto Rican economic crisis and materially misrepresented the risk level of Resource Capital's commercial real estate loan portfolio by failing to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets. Specifically, the November 12, 2013 Form 10-Q averred that all mezzanine loans had solid risk ratings of one out of four as of September 30, 2013, with four representing the lowest rating, and also omitted any disclosures concerning Puerto Rico or its troubled economy when boasting:

### Commercial Real Estate Loans

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of September 30, 2013** | | | | | | |
| Whole loans | $ 591,105 | $ 44,943 | $ 32,067 | $ — | $ — | $ 668,115 |
| B notes | 16,238 | — | — | — | | 16,238 |
| Mezzanine loans | 57,574 | — | — | — | — | 57,574 |
| | $ 664,917 | $ 44,943 | $ 32,067 | $ — | $ — | $ 741,927 |
| | | | | | | |
| **As of December 31, 2012** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ 34,000 | $ 567,938 |
| B notes | 16,327 | — | — | — | | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $ — | $ 150,972 | $ — | $ 34,000 | $ 667,051 |

*All of the Company's commercial real estate loans were performing as of September 30, 2013 and December 31, 2012.*

73.     The November 12, 2013 Form 10-Q also misrepresented Resource Capital's mezzanine loan portfolio as not containing any troubled-debt restructurings as of September 30, 2013 stating:

<u>Troubled-Debt Restructurings</u>

The following tables show troubled-debt restructurings in the Company's  loan portfolio (in thousands):

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| **Three Months Ended September 30, 2013:** | | | |
| Whole loans | 2 | $ 48,374 | $ 52,716 |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Loans receivable - related party | — | — | — |
| Total loans | 2 | $ 48,374 | $ 52,716 |
| | | | |
| **Three Months Ended September 30, 2012:** | | | |
| Whole loans | 2 | $ 42,550 | $ 42,550 |
| B notes | — | — | — |
| Mezzanine loans | 1 | 38,072 | 38,072 |
| Bank loans | — | — | — |
| Loans receivable | — | — | — |
| Loans receivable - related party | — | — | — |
| Total loans | 3 | $ 80,622 | $ 80,622 |
| | | | |
| **Nine Months Ended September 30, 2013:** | | | |
| Whole loans | 4 | $ 104,702 | $ 109,044 |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Loans receivable - related party | 1 | 6,592 | 6,592 |
| Total loans | 5 | $ 111,294 | $ 115,636 |
| | | | |
| **Nine Months Ended September 30, 2012:** | | | |
| Whole loans | 5 | $ 168,708 | $ 151,422 |
| B notes | — | — | — |
| Mezzanine loans | 1 | 38,072 | 38,072 |
| Bank loans | — | — | — |
| Loans receivable | — | — | — |
| Loans receivable - related party | 1 | 7,797 | 7,797 |
| Total loans | 7 | $ 214,577 | $ 197,291 |

*As of September 30, 2013 and December 31, 2012, there were no troubled-debt restructurings that subsequently defaulted.*

74.    Finally, the November 12, 2013 Form 10-Q continued to mislead investors with respect to the Company's then-existing internal controls through SOX certifications signed by defendants J. Cohen and Bryant stating:

1.    I have reviewed this report on Form 10-Q for the quarter ended September

30, 2013 of Resource Capital Corp.;

2.   ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a.   ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;***

   b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.   ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

b.   ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***

75.   On February 26, 2014, weeks after all three major credit rating agencies downgraded Puerto Rico's debt to junk status, Resource Capital held an earnings conference call with analysts and investors to discuss the Company's fourth quarter and full year 2013 financial performance. During the call, defendant Bryant continued to proclaim that all of the Company's real estate loans are current and performing, and that Resource Capital's bank loan portfolio was "very benign." Defendant Bryant stated:

> We added 700,000 to our real estate loan reserves, primarily for our previously impaired loan. Overall, real estate credit has been excellent and ***I characterize our bank loan portfolio as very benign***. Three bank loans totaling $3.6 million are delinquent out of a portfolio of $580 million and ***all 57 of our real estate loans are current and performing***.

76.   On March 3, 2014, while Puerto Rico continued its devastating downward economic spiral, Resource Capital filed with the SEC its Annual Report on Form 10-K for the fiscal year ended December 31, 2014 (the "2013 Form 10-K").  The 2013 Form 10-K was signed by defendant J. Cohen as a director, President, and CEO; defendant Bryant as Senior Vice President, CFO, CAO, and Treasurer; and by defendant directors Kessler, Beach, E. Cohen, Fore, Hart, Ickowicz, Levin, Neff, and Wiggins on behalf of themselves and the Company.

77.   Like the 2012 Form 10-K, the 2013 Form 10-K admitted that certain geographic concentrations could affect the performance of the Company's investments, but omitted to disclose already-materialized facts arising from Resource Capital's exposure to Puerto Rico within its commercial real estate loan portfolio. Furthermore, the 2013 Form 10-K again portrayed the geographic distribution of the portfolio as limited to the mainland United States through the

inclusion of the following chart which conspicuously omitted any exposure on the part of the Company to Puerto Rico:



78.     The Management Discussion and Analysis section of the 2013 Form 10-K similarly misrepresented Resource Capital's real estate-related assets as solely located in the United States and that all necessary provisions for loan loss and impairments had been made by the Company.  In particular, without any mention of Puerto Rico, the 2013 Form 10-K stated:

> ***Although economic conditions in the United States have improved, previous conditions in real estate and credit markets continue to affect both us and a number of our commercial real estate borrowers***. Over a period of several years, we entered into loan modifications with respect to 17 of our outstanding commercial real estate loans. During the past three years, we have added to our provision for loan losses to reflect the effect of these conditions on our borrowers and have recorded both temporary and other than temporary impairments in the market valuation of  [commercial mortgage-backed securities] and  [asset-backed securities] in  our investment portfolio. However, during 2012 and into December 31, 2013, the improved economic conditions led  to a stabilization in the credit quality of  our portfolio and, as a result, our  provision for loan losses has decreased significantly for 2013. We expensed  provisions of $3.0 million for the year ended

December 31, 2013 as compared to provisions of $16.8 million for the year ended December 31, 2012. Our asset impairments have increased slightly, we recognized asset impairments of $863,000 for the year ended December 31, 2013 as compared to $180,000 for the year ended December 31, 2012. We also saw a marked improvement in other comprehensive income with respect to our available for sale securities portfolio and interest rate derivatives, which declined to a loss of $14.0 million at December 31, 2013 from a loss of $27.1 million at December 31, 2012. While we believe we have appropriately valued the assets in our investment portfolio at December 31, 2013, we cannot assure you that further impairments will not occur or that our assets will otherwise not be adversely affected by market conditions.

79.     Similarly, the Commercial Real Estate Loans section of the 2013 Form 10-K omitted any information concerning the Company's already materialized increased risk with respect to its mezzanine loans involving Puerto Rico, and misrepresented that all mezzanine loans had solid risk ratings of one or two out of four as of the end of 2013, with four representing the lowest rating. The 2013 Form 10-K also touted again that all of Resource Capital's commercial real estate loans, including all mezzanine loans, were performing stating:

### Commercial Real Estate Loans

We use a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing our highest rating and 4 representing our lowest rating. We designate loans that are sold after the period end at the lower of our fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, we consider such things as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading our commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of December 31, 2013:** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | | | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |
| | | | | | | |
| **As of December 31, 2012:** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ 34,000 | $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $ — | $ 150,972 | $ — | $ 34,000 | $ 667,051 |

*All of our commercial real estate loans were performing as of December 31, 2013 and 2012*.

80.     The 2013 Form 10-K also misrepresented Resource Capital's mezzanine loan portfolio as not containing any troubled-debt restructurings as of December 31, 2013, stating:

<u>Troubled-Debt Restructurings</u>

The following tables show troubled-debt restructurings in our loan portfolio (in thousands):

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| **Year Ended December 31, 2013:** | | | |
| Whole loans | 5 | $ 143,484 | $ 147,826 |
| B notes | — | — | — |
| **Mezzanine loans** | — | — | — |
| Bank loans | — | — | — |
| Residential mortgage loans | — | — | — |
| Loans receivable - related party | 1 | 6,592 | 6,592 |
| Total loans | 6 | $ 150,076 | $ 154,418 |
| | | | |
| **Year Ended December 31, 2012:** | | | |
| Whole loans | 6 | $ 143,261 | $ 126,946 |
| B notes | — | — | — |
| Mezzanine loans | 1 | 38,072 | 38,072 |
| Bank loans | — | — | — |
| Loans receivable - related party | 1 | 7,797 | 7,797 |
| Total loans | 8 | $ 189,130 | $ 172,815 |

*As of December 31, 2013 and 2012, there were no troubled-debt restructurings that subsequently defaulted.*

81.    Finally, the 2013 Form 10-K again misled investors with respect to the Company's then-existing internal controls by representing in the body of the 10-K and through SOX certifications signed by defendants J. Cohen and Bryant stating:

**Disclosure Controls and Procedures**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our Securities Exchange Act of 1934 reports is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and our Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

Under the supervision of our Chief Executive Officer and Chief Financial Officer, we have carried out an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective at the reasonable assurance level.

\* \* \*

1.    I have reviewed this report on Form 10-K for the year ended December 31, 2013 of Resource Capital, Corp.;

2.    ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for

- 48 -

establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;***

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

    b. ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***

82.     On May 7, 2014, one week after Fitch Ratings downgraded the 2007-WHALE8 Trust as a result of "[e]xceptionally high levels of credit risk" in which "[d]efault appears imminent or inevitable," Resource Capital held an earnings conference call with analysts and investors to discuss the Company's first quarter 2014 financial performance.  During the call, defendant Bloom reiterated that the Company's entire commercial real estate loan portfolio is performing stating:

> Credit across the portfolio continues to trend in very positive direction, with improving metrics across all assets classes. The majority of the properties securing our loans are continuing to realize improved cash flow and receiving borrower's plans for value creation well on or ahead of track. Once again, I'm pleased to report that **the entire commercial real estate loan portfolio is performing with no defaults**.

83.     Two days later, on May 9, 2014, Resource Capital filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended March 31, 2014, signed by defendants J. Cohen and Bryant on behalf of themselves and the Company (the "May 9, 2014 Form 10-Q").  While again failing to disclose any of the above noted facts concerning the shoddy credit quality of the Mezzanine Loan or the various credit rating downgrades to the 2007-WHALE8 Trust, the May 9, 2014 Form 10-Q misled investors concerning the increased risks with respect to the Mezzanine Loan, averred that all mezzanine loans had solid risk ratings of one or two out of four, with four representing the lowest rating, and again boasted that all of the Company's commercial real estate loans were performing stating:

### Commercial Real Estate Loans

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period ends at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of March 31 2014** | | | | | | |
| Whole loans | $ 768,243 | $ 32,500 | $ 33,110 | $ — | $ — | $ 833,853 |
| B notes | 16,168 | — | — | — | — | 16,168 |
| Mezzanine loans | 51,832 | 12,467 | — | — | — | 64,299 |
| | $ 836,243 | $ 44,967 | $ 33,110 | $ — | $ — | $ 914,320 |
| | | | | | | |
| **As of December 31, 2013** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |

*All of the Company's commercial real estate loans were performing as of March 31, 2014 and December 31, 2013.*

84.     The May 9, 2014 Form 10-Q also improperly misrepresented that Resource Capital's mezzanine loan portfolio did not contain any troubled-debt restructurings as of March 31, 2014, stating:

*Troubled-Debt Restructurings*

**The Company had no troubled-debt restructurings during the three months ended March 31, 2014.**

The following table shows troubled-debt restructurings in the Company's loan portfolio (in thousands) during the three months ended March 31, 2013:

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| Whole loans | 6 | $ 153,958 | $ 136,672 |
| B notes | — | | — |
| Mezzanine loans | 1 | 38,072 | 38,072 |
| Bank loans | — | | — |
| Residential mortgage loans | — | — | — |
| Loans receivable - related party | 1 | 7,797 | 7,797 |
| Total loans | 8 | $ 199,827 | $ 182,541 |

*As of March 31, 2014 and 2013, there were no troubled-debt restructurings that subsequently defaulted.*

- 51 -

85.    Finally, the May 9, 2014 Form 10-Q continued to mislead investors with respect to the Company's then-existing internal controls through SOX certifications signed by defendants J. Cohen and Bryant stating:

1.    I have reviewed this report on Form 10-Q for the quarter ended March 31, 2014 of Resource Capital, Corp.;

2.    ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a.    ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***;

   b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the

- 52 -

registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.   ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

    b.   ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***

86.   On August 6, 2014, Resource Capital held an earnings conference call with analysts and investors to discuss the Company's second quarter 2014 financial performance. During the call, defendant Bloom reiterated that ***"the entire commercial real estate loan portfolio is performing with no defaults."***

87.   On August 8, 2014, Resource Capital filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended June 30, 2014, signed by defendants Bryant and Blackwell on behalf of themselves and the Company (the "August 8, 2014 Form 10-Q"). Like the previous Forms 10-Q discussed above, the August 8, 2014 Form 10-Q misled investors by failing to disclose multiple materialized facts concerning Resource Capital's exposure to Puerto Rico within its commercial real estate loan portfolio. Indeed, the August 8, 2014 Form 10-Q incorporated the "Risk Factors" disclosed in the 2013 Form 10-K and admitted that certain geographic concentrations could affect the performance of the Company's investments, yet completely omitted any information concerning the Company's exposure to the Puerto Rican economic crisis. The August 8, 2014 Form 10-Q also again materially misrepresented the risk level of Resource Capital's commercial real estate loan portfolio as level one and two risk and omitted any relevant information

concerning the Company's already materialized increased risk with respect to its mezzanine loans involving Puerto Rican assets when stating:

### Commercial Real Estate Loans

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period ends at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of June 30, 2014** | | | | | | |
| Whole loans | $ 900,246 | $ 32,500 | $ 22,000 | $ — | $ — | $ 954,746 |
| B notes | 16,138 | — | — | — | — | 16,138 |
| Mezzanine loans | 45,460 | 21,800 | — | — | — | 67,260 |
| | $ 961,844 | $ 54,300 | $ 22,000 | $ — | $ — | $ 1,038,144 |
| | | | | | | |
| **As of December 31, 2013** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |

*All of the Company's commercial real estate loans were current as of June 30, 2014 and December 21, 2013.*

88.   The August 8, 2014 Form 10-Q also improperly represented that Resource Capital's mezzanine loan portfolio did not contain any troubled-debt restructurings as of June 30, 2014, stating:

### Troubled-Debt Restructurings

*The Company had no troubled-debt restructurings during the three months ended June 30, 2014 and 2013 or during the six months ended June 30, 2014.*

The following table shows troubled-debt restructurings in the Company's loan portfolio during the six months ended June 30, 2013 (in thousands):

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| **Six Months Ended June 30, 2013** | | | |
| Whole loans | 2 | $ 56,328 | $ 56,328 |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Residential mortgage loans | — | — | — |
| Loans receivable - related party | 1 | 6,592 | 6,592 |
| Total loans | 3 | $ 62,920 | $ 62,920 |

*As of June 30, 2014 and 2013, there were no troubled-debt restructurings that subsequently defaulted.*

89. In addition, the August 8, 2014 Form 10-Q misled investors with respect to the Company's then-existing internal controls through SOX certifications signed by defendants J. Cohen and Bryant stating:

1. I have reviewed this report on Form 10-Q for the quarter ended June 30, 2014 of Resource Capital, Corp.;

2. *Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;*

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the*

*registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared*;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

(b)    *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting*.

90.    On November 4, 2014, Resource Capital held an earnings conference call with analysts and investors to discuss the Company's third quarter 2014 financial performance. During the call, defendants Bloom and Bryant reiterated that all of the Company's real estate portfolio and loans were performing and current, with no defaults stating:

[Defendant Bloom:] I am once again pleased to report that the *entire commercial real estate portfolio is performing with no defaults*.

*   *   *

[Defendant Bryant:] Two bank loans for $2.3 million are delinquent out of a portfolio of $712 million, just 32 basis points, and all of our 65 real estate loans totaling $1.1 billion are current.

91.     On November 10, 2014, Resource Capital filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended September 30, 2014, signed by defendants Bryant and Blackwell on behalf of themselves and the Company (the "November 10, 2014 Form 10-Q"). In substantially similar fashion to the Forms 10-Q detailed above, the November 10, 2014 Form 10-Q misrepresented that all of the Company's commercial real estate loans were "current" with risk levels of one or two. The November 10, 2014 Form 10-Q also continued to omit crucial information concerning Company's exposure to the Puerto Rico economic crisis and materially misrepresent the risk level of Resource Capital's commercial real estate loan portfolio by failing to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rico's assets stating:

### Commercial Real Estate Loans

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period ends at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers factors such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of September 30, 2014** | | | | | | |
| Whole loans | $ 990,471 | $ 32,500 | $ — | $ — | $ | $ 1,022,971 |
| B notes | 16,107 | — | — | — | | 16,107 |
| Mezzanine loans | 45,447 | 21,858 | — | — | — | 67,305 |
| | $ 1,052,025 | $ 54,358 | $ — | $ — | $ — | $ 1,106,383 |
| | | | | | | |
| **As of December 31, 2013** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ | $ 745,789 |
| B notes | 16,205 | — | — | — | | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |

*All of the Company's commercial real estate loans were current as of September 30, 2014 and December 31, 2013.*

92.    The November 10, 2014 Form 10-Q also continued to mislead investors with respect to the Company's then-existing internal controls through SOX certifications signed by defendants J. Cohen and Bryant stating:

1.    I have reviewed this report on Form 10-Q for the quarter ended September 30, 2014 of Resource Capital Corp.;

2.    *Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;*

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known*

- 58 -

*to us by others within those entities, particularly during the period in which this report is being prepared;*

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

(b)    *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.*

93.    On February 26, 2015, Resource Capital held an earnings conference call with analysts and investors to discuss the Company's fourth quarter and full-year 2014 financial performance. During the call, defendants Bloom and Bryant reiterated that the Company's entire commercial real estate portfolio was performing with no defaults, and that all real estate loans were current stating:

[Defendant Bloom:] We will continue to utilize our $600 million term financing facilities to support the growth of our new loan originations, and we plan to access

the [collateralized loan obligations] market to optimally match fund our assets on a regular basis. We note improving credit metrics across all asset classes represented in our commercial real-estate loan portfolio, the majority of the properties securing our loans continuing to realize improved cash flow with borrowers' plans for value creation well on track. *I am once again pleased to report the entire commercial real estate portfolio is performing with no defaults*.

\* \* \*

[Defendant Bryant:] …Two bank loans $1.4 million are delinquent out of a portfolio of $323 million, 41 basis points and *all 78 of our real estate loans are current*.

Of note, for Q4 we were able to sell off two remaining real estate properties for gains of $3.2 million bringing 2014 gains to $6.1 million.

94.     On March 2, 2015, while non-Puerto Rican properties from the portfolio were being dumped from the 2007-WHALE8 Trust and the portfolio was becoming heavily concentrated in Puerto Rican hotels, Resource Capital filed with the SEC its Annual Report on Form 10-K for the fiscal year ended December 31, 2014 (the "2014 Form 10-K").  The 2014 Form 10-K was signed by defendant J. Cohen as a director, President, and CEO; defendant Bryant as Senior Vice President, CFO, and Treasurer; defendant Blackwell as CAO; and by defendant directors Kessler, Beach, E. Cohen, Fore, Hart, Ickowicz, Levin, Neff, and Wiggins on behalf of themselves and the Company. The 2014 Form 10-K continued to materially mislead investors by admitting that certain geographic concentrations could affect the performance of the Company's investments while failing to disclose negative material facts that had already come to fruition concerning Resource Capital's exposure to Puerto Rico within its commercial real estate loan portfolio.  Furthermore, in the following chart, the 2014 Form 10-K portrayed the geographic distribution of Resource Capital's commercial real estate loan portfolio as limited to the mainland United States, and omitted any of the Company's exposure to Puerto Rico's economic crisis:



**Geographic Area by State**

95.     The 2014 Form 10-K also included a Management Discussion and Analysis section, which contained the following statement misrepresenting that Resource Capital's real estate-related assets were solely located in the United States and that all necessary provisions for loan loss and impairments had been made by the Company:

> Although economic conditions in the United States have improved, previous conditions in real estate and credit markets continue to affect both us and a number of our commercial real estate borrowers. Over a period of several years, we entered into loan modifications with respect to 14 of our remaining outstanding commercial real estate loans. During the past 21 months, we have adjusted our provision for loan losses to reflect the effect of these conditions on our borrowers as well as, where necessary, market-related temporary adjustments to the market valuations of both [commercial mortgage-backed securities] and [asset-backed securities] in our investment portfolio. However, during 2013 and continuing through December 31, 2014, *the improved economic conditions led to a stabilization in the credit quality of our portfolio and, as a result, our provision for loan losses has decreased significantly in 2014.* For the year ended December 31, 2014, we have a net recovery in the provision for loan losses of $1.8 million, primarily due to the successful refinancing of a commercial real estate loan position on which we had previously established a significant reserve for credit loss. Also, other comprehensive income saw an increase of $20.1

million at December 31, 2014. While we believe we have appropriately valued the assets in our investment portfolio at December 31, 2014, we cannot assure you that further impairments will not occur or that our assets will otherwise not be adversely affected by market conditions.

96.    The 2014 Form 10-K also materially misrepresented the risk level of Resource Capital's commercial real estate loan portfolio, particularly with respect to Puerto Rican-backed assets, by failing to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets and averring that all mezzanine loans were "performing" with a risk level of one or two stating:

### *Commercial Real Estate Loans*

We use a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing our highest rating and 4 representing our lowest rating. We value loans that are sold after the period end at the lower of our fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, we consider such things as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading our commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

|  | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of December 31, 2014:** | | | | | | |
| Whole loans | $ 1,231,092 | $ 32,500 | $ — | $ — | $ — | $ 1,263,592 |
| B notes | 16,072 | — | — | — | | 16,072 |
| Mezzanine loans | 45,432 | 21,934 | — | — | — | 67,366 |
| | $ 1,292,596 | $ 54,434 | $ — | $ — | $ — | $ 1,347,030 |
| **As of December 31, 2013:** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |

***All of our commercial real estate loans were performing as of December 31, 2014 and 2013***.

97.     In addition to the above, the 2014 Form 10-K misled investors with respect to the Company's then-existing internal controls by representing in the body of the 2014 Form 10-K and through SOX certifications signed by defendants J. Cohen and Bryant that:

**<u>Disclosure Controls and Procedures</u>**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our Securities Exchange Act of 1934 reports is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and our Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

Under the supervision of our Chief Executive Officer and Chief Financial Officer, we have carried out an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective at the reasonable assurance level.

\* \* \*

1.      I have reviewed this report on Form 10-K for the year ended December 31, 2014 of Resource Capital, Corp.;

2.      ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over

financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;***

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

(b) ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.

98.     On May 6, 2015, Resource Capital held an earnings conference call with analysts and investors to discuss the Company's first quarter 2015 financial performance. During the call, defendant Bloom reiterated that he was "once again pleased to report that the entire commercial

real estate loan portfolio is performing with no defaults," while defendant Bryant confirmed that "all 79 of [Resource Capital's] real estate loans totaling $1.5 billion are current."

99.    On May 11, 2015, Resource Capital filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended March 31, 2015, signed by defendants Bryant and Blackwell on behalf of themselves and the Company (the "May 11, 2015 Form 10-Q"). The May 11, 2015 Form 10-Q, which incorporated the "Risk Factors" disclosed in the 2014 Form 10-K, continued to omit material information concerning the Company's risky exposure to Puerto Rico's economic crisis while at the same time admitting that certain geographic concentrations could affect the performance of the Company's investments. The May 11, 2015 Form 10-Q further materially misrepresented the risk level of Resource Capital's commercial real estate loan portfolio as "current" with level one and two risk, and by failing to disclose materialized risks related to the Puerto Rican economy when stating the following about its mezzanine loans involving Puerto Rican assets:

### Commercial Real Estate Loans

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| As of March 31, 2015 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Whole loans | $ 1,329,882 | $ 32,500 | $ — | $ — | $ — | $ 1,362,382 |
| B notes | 16,031 | — | — | — | — | 16,031 |
| Mezzanine loans | 45,417 | 22,054 | — | — | — | 67,471 |
| | $ 1,391,330 | $ 54,554 | $ — | $ — | $ — | $ 1,445,884 |

| As of December 31, 2014: | | | | | | | |
|---|---|---|---|---|---|---|---|
| Whole loans | $ 1,231,092 | $ 32,500 | $ — | $ — | $ — | $ 1,263,592 |
| B notes | 16,072 | — | — | — | — | 16,072 |
| Mezzanine loans | 45,432 | 21,934 | — | — | — | 67,366 |
| | $ 1,292,596 | $ 54,434 | $ — | $ — | $ — | $ 1,347,030 |

*All of the Company's commercial real estate loans were current as of March 31, 2015 and December 31, 2014.*

100.   The May 11, 2015 Form 10-Q also misrepresented that Resource Capital's mezzanine loan portfolio did not contain any troubled-debt restructurings as of March 31, 2015:

*Troubled-Debt Restructurings*

The following tables show troubled-debt restructurings in the Company's loan portfolio (in thousands):

*The Company had no troubled-debt restructurings during the three months ended March 31, 2014. As of March 31, 2015 and 2014, there were no* commercial real estate loan troubled-debt restructurings that subsequently defaulted.

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | | Post-Modification Outstanding Recorded Balance | |
|---|---|---|---|---|---|
| Residential mortgage loans | — | | — | | — |
| Loans receivable - related party | — | | — | | — |
| Total loans | 2 | $ | 67,459 | $ | 67,459 |

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | | Post-Modification Outstanding Recorded Balance | |
|---|---|---|---|---|---|
| Three Months Ended March 31, 2015: | | | | | |
| Whole loans | 2 | $ | 67,459 | $ | 67,459 |
| B notes | — | | — | | — |
| Mezzanine loans | — | | — | | — |
| Bank loans | — | | — | | — |
| Middle market loans | — | | — | | — |

101.    Finally, the May 11, 2015 Form 10-Q continued to mislead investors with respect to the Company's then-existing internal controls through SOX certifications signed by defendants J. Cohen and Bryant stating:

1.    I have reviewed this report on Form 10-Q for the quarter ended March 31, 2015 of Resource Capital Corp.;

2.    ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;***

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most

- 67 -

recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)   *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

(b)   *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.*

## THE INDIVIDUAL DEFENDANTS CAUSE RESOURCE CAPITAL TO FILE MATERIALLY MISLEADING PROXY STATEMENTS

102.   Defendants negligently issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to stockholders in Resource Capital's 2014 and 2015 Proxy Statements. Plaintiff's allegations with respect to the misleading statements in the 2014 and 2015 Proxy Statements are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

**The Materially Misleading 2014 Proxy Statement**

103.   On April 16, 2014, defendants J. Cohen, E. Cohen, Kessler, Levin, Neff, Beach, Hart, Ickowicz, Fore, and Wiggins caused Resource Capital to file with the SEC its Proxy Statement in connection with the 2014 Annual Meeting of Stockholders, held on May 29, 2014 (the "2014 Proxy"). In the 2014 Proxy, defendants solicited stockholder votes to, among other

things, re-elect themselves to the Board and approve the Company's Amended and Restated Omnibus Equity Compensation Plan (the "Omnibus Plan") to increase the number of shares authorized for issuance under the Omnibus Plan from 5.4 million shares to 13.1 million shares. Defendants issued materially misleading statements with respect the solicited votes.

104.    The 2014 Proxy stated the following in support of re-electing the then current directors:

### Board Leadership Structure and Role in Risk Oversight

We have no specific policy with respect to the separation of the offices of Chairman and the Chief Executive Officer. Currently, Steven J. Kessler serves as Chairman of the Board and Jonathan Z. Cohen serves as Chief Executive Officer. The Board believes that our Corporate Governance Guidelines provide it with appropriate flexibility to determine from time to time the leadership structure that best enables us to pursue our business strategies and goals. The Board believes that its current leadership structure is appropriate in that it gives us the benefit of the significant expertise that both Messrs. Kessler and J. Cohen have in finance and real estate, as well as the working relationship they have developed in the past eighteen years.

***Risk management, led by our officers and the Board, is a company-wide function that is responsible for an integrated effort to identify, assess and manage risks that may affect our ability to execute on our business strategy and fulfill our business objectives. The Board's role is to oversee this function. The Audit Committee enhances the Board's oversight of risk management.*** The Audit Committee's role is also one of oversight, recognizing that management is responsible for executing our risk management policies. ***The Audit Committee's responsibilities include discussing with management our major financial risk exposures and the steps management has taken to monitor and control such exposures, including our risk assessment and risk management policies. The Audit Committee also discusses guidelines and policies to govern the process by which risk assessment and management is undertaken.***

\* \* \*

### Relationships and Related Party Transactions

*Relationship with Resource America and Certain of its Subsidiaries.* As of April 8, 2014, Resource America, entities affiliated with it and our executive officers and directors collectively beneficially own 6,731,089 shares of common stock, representing approximately 5.23% of our common stock on a fully-diluted basis. In addition, Resource America holds 2,166 options to purchase common stock. Our executive officers are also officers of Resource Capital Manager, our Manager, and/or of Resource America or its subsidiaries.

- 69 -

*For the year ended December 31, 2013, the Manager earned base management fees of approximately $11.6 million and incentive management fees of $1.9 million (including $484,000 paid in the form of 80,189 shares of common stock) and received $3.8 million in expense reimbursements. We are externally managed by the Manager pursuant to a management agreement under which the Manager is entitled to base management fees, incentive management fees* and expense reimbursements, including reimbursement for the wages, salaries and benefits of our Chairman, our Chief Financial Officer and several accounting professionals, reimbursement for 50% of the salary and benefits of the director of investor relations, and reimbursement for a proportional share of wages, salaries and benefits of Resource America personnel who perform legal, accounting and other services that outside professionals or consultants would otherwise perform. In addition, subsidiaries of ours which are designated as "ancillary operating subsidiaries" reimburse Resource America, subject to the approval of our independent directors, for the compensation costs incurred by the Manager or Resource America for personnel principally devoted to the subsidiary's business. The management agreement defines an "ancillary operating subsidiary" as a subsidiary of ours, including a taxable REIT subsidiary, that is an operating entity principally engaged in the evaluation, underwriting, origination, servicing, holding, trading and financing of loans, securities, investments and credit products other than commercial real estate loans.

105.    Defendants' statements misleadingly suggested that: (i) the Board and the Audit Committee provided adequate oversight to properly identify, assess, and manage risks, and also to control exposure to financial risks; and (ii) the management fees paid to affiliates at the Resource Manager were appropriate and were not based on inflated and inaccurate equities.  In addition, the 2014 Proxy omitted any disclosures reflecting the known financial risks associated with the Mezzanine Loan, the likelihood that the Company would need to record an allowance for loan loss on the Mezzanine Loan, or the extent of the excessive fees paid to the Resource Manager.

106.    The 2014 Proxy harmed Resource Capital by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  As a result of the Individual Defendants' misleading statements in the 2014 Proxy, Resource Capital's stockholders voted to re-elect defendants J. Cohen, E. Cohen, Kessler, Levin, Neff, Beach, Hart, Ickowicz, Fore, and Wiggins to Resource Capital's Board.

107.    With respect to the proposed amendments to the Omnibus Plan, the 2014 Proxy

stated the following:

Our Board of Directors has amended and restated the Resource Capital Corp.
Omnibus Equity Compensation Plan, which we refer to herein as the Omnibus Plan,
to be effective as of May 29, 2014, subject to stockholder approval. The Omnibus
Plan has been amended to: (i) increase the number of shares authorized for issuance
under the Omnibus Plan from 5,400,000 shares to 13,100,000 shares; (ii) extend the
expiration date of the Omnibus Plan to May 29, 2024; and (iii) make other clarifying
and updating amendments to the Omnibus Plan. The Board of Directors recommends
approval of the Omnibus Plan by our stockholders at the Meeting.

Stockholder approval is being sought (i) so that the compensation attributable to
grants under the Omnibus Plan may qualify for an exemption from the $1,000,000
deduction limit under section 162(m) of the Internal Revenue Code of 1986, as
amended, or the Code, (see discussion of section 162(m) under "Federal Income Tax
Consequences" below), (ii) in order for incentive stock options to meet the
requirements of the Code, and (iii) in order to meet New York Stock Exchange
requirements. If the stockholders do not approve the Omnibus Plan, the 2007
Omnibus Equity Compensation Plan, as previously amended and restated, will
continue in effect without regard to this restatement of the Omnibus Plan.

As of April 8, 2014, we had 128,577,980 common shares outstanding. Additionally,
as of March 18, 2014, we had 137,981 shares available for grant under the Omnibus
Plan and 2,597 shares available under the 2005 Stock Incentive Plan. Also, as of
March 18, 2014, we had a total of 640,666 stock options outstanding under our equity
compensation plans with a weighted average exercise price of $14.45 and weighted
average remaining term of 1.59 years, and a total of 2,428,452 full-value awards
outstanding under our equity compensation plans. Other than the foregoing, no other
compensatory awards under our equity compensation plans or otherwise were
outstanding or available for grant as of March 18, 2014.

In order to better manage our burn rate and align it with best industry practices, we
commit that, with respect to awards granted over the next three fiscal years (2014, 2015 and 2016), we
will maintain an average annual burn rate over that period that does not exceed 2.86% of weighted common shares
outstanding. For purposes of calculating the number of shares granted in a particular
fiscal year, all awards will first be converted into option-share equivalents. In this
case, each share that is subject to awards other than options or [stock appreciation
rights] will count as equivalent to 2.5 option shares.

**The Board believes that the approval of the Omnibus Plan by the stockholders will
further our compensation structure and strategy. Our ability to attract, retain and
motivate top quality employees, directors and other persons who provide services
to us, including portfolio managers and other employees of the Manager and
Resource America, is material to our success, and the Board has concluded that
this would be enhanced by our ability to make grants under the Omnibus Plan. In**

*addition, the Board believes that the interests of our company and stockholders will be advanced if we can offer employees and non-employee directors the opportunity to acquire or increase their proprietary interests in our company.* Our existing 2005 Stock Incentive Plan will continue in effect according to its terms.

108.     These statements were misleading because, here, additional stock would do nothing to align the interests of Resource Capital's directors with the interests of Resource Capital's stockholders.  As discussed herein, defendants J. Cohen, E. Cohen, Kessler, Levin, Neff, Beach, Hart, Ickowicz, Fore, and Wiggins are beholden to Resource America and the Resource Manager, which effectively control Resource Capital.  Accordingly, defendants J. Cohen, E. Cohen, Kessler, Levin, Neff, Beach, Hart, Ickowicz, Fore, and Wiggins are concerned with Resource America's interests, not Resource Capital stockholders' interests.  The additional equity made available would not do anything to alter those true interests, which align with Resource America but diverge from the interests of Resource Capital's stockholders at large.  Therefore, the above statements are materially misleading.  If Resource Capital's stockholders knew that the additional equity would not align the directors' interests with their own and would not attract or motivate the directors, as claimed, and that the additional stock compensation was essentially a gift to the faithless directors, stockholders would not have approved the Omnibus Plan.

**The Materially Misleading 2015 Proxy Statement**

109.     On April 23, 2015, defendants J. Cohen, E. Cohen, Kessler, Levin, Neff, Beach, Hart, Ickowicz, Fore, and Wiggins caused Resource Capital to file with the SEC its Proxy Statement in connection with the 2015 Annual Meeting of Stockholders, held on June 3, 2015 (the "2015 Proxy").  In the 2015 Proxy, defendants solicited stockholder votes to, among other things, re-elect themselves to the Board.  Defendants issued materially misleading statements with respect the solicited votes.

110.     The 2015 Proxy stated the following in support of re-electing the then current directors:

**Board Leadership Structure and Role in Risk Oversight**

We have no specific policy with respect to the separation of the offices of Chairman and the Chief Executive Officer. Currently, Steven J. Kessler serves as Chairman of the Board and Jonathan Z. Cohen serves as Chief Executive Officer. The Board believes that our Corporate Governance Guidelines provide it with appropriate flexibility to determine from time to time the leadership structure that best enables us to pursue our business strategies and goals. The Board believes that its current leadership structure is appropriate in that it gives us the benefit of the significant expertise that both Messrs. Kessler and J. Cohen have in finance and real estate, as well as the working relationship they have developed in the past eighteen years.

*Risk management, led by our officers and the Board, is a company-wide function that is responsible for an integrated effort to identify, assess and manage risks that may affect our ability to execute on our business strategy and fulfill our business objectives. The Board's role is to oversee this function. The Audit Committee enhances the Board's oversight of risk management.* The Audit Committee's role is also one of oversight, recognizing that management is responsible for executing our risk management policies. *The Audit Committee's responsibilities include discussing with management our major financial risk exposures and the steps management has taken to monitor and control such exposures, including our risk assessment and risk management policies. The Audit Committee also discusses guidelines and policies to govern the process by which risk assessment and management is undertaken.*

\* \* \*

**Relationships and Related Party Transactions**

*Relationship with Resource America and Certain of its Subsidiaries.* As of April 17, 2015, Resource America, entities affiliated with it and our executive officers and directors collectively beneficially own 7,114,956 shares of common stock, representing approximately 5.30% of our common stock on a fully-diluted basis. *Our executive officers are also officers of Resource Capital Manager, our Manager, and/or of Resource America or its subsidiaries.*

*For the year ended December 31, 2014, Resource Capital Manager, or the Manager, earned base management fees of approximately $13 million. There were no incentive management fees earned in 2014. We reimburse the Manager and Resource America for expenses and employees of Resource America who perform legal, accounting, due diligence and other services that outside professionals or consultants would otherwise perform. The Management Agreement, as amended, also provides that the Manager must furnish us with a director of investor relations who will be 50% dedicated to our operations.* We bear the expense of the wages, salaries and benefits of our Chairman, Chief Financial Officer and several accounting and tax professionals and 50% of the salary and benefits of the director of investor relations. On November 7, 2013, we entered into another amendment to include the definition of an "Ancillary

Operating Subsidiary" which means one or more subsidiaries, including a TRS and its subsidiaries, that is an operating entity principally engaged in the evaluation, underwriting, origination, servicing, holding, trading and financing of loans, securities, investments and credit products other than commercial real estate loans.

111.    Defendants' statements misleadingly suggested that: (i) the Board and the Audit Committee provided adequate oversite to properly identify, assess, and manage risks, and also to control exposure to financial risks; and (ii) the management fees paid to affiliates at the Resource Manager were appropriate and were not based on inflated and inaccurate equities.  In addition, the 2015 Proxy omitted any disclosures reflecting the known financial risks associated with the Mezzanine Loan or the likelihood that the Company would need to record an allowance for loan loss on the Mezzanine Loan.

112.    The 2015 Proxy harmed Resource Capital by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  As a result of the Individual Defendants' misleading statements in the 2015 Proxy, Resource Capital's stockholders again voted to re-elect defendants J. Cohen, E. Cohen, Kessler, Levin, Neff, Beach, Hart, Ickowicz, Fore, and Wiggins to Resource Capital's Board.

## THE TRUTH SLOWLY EMERGES

113.    The truth finally began to emerge on August 4, 2015.  On that date, after the close of the market, Resource Capital announced its financial results for the quarter ended June 30, 2015.  The Company shocked the market when it disclosed GAAP net loss of $31 million during the quarter and attributed the loss to Resource Capital's recording of an allowance for loan loss on a mezzanine loan position of $41.1 million in total. As disclosed in the August 4, 2015 press release, "[t]he last three luxury brand hotel properties securing the loan are located in or near San Juan, Puerto Rico, and recent economic and credit disruptions in Puerto Rico resulted in events that caused the Company to determine that the loan should be fully reserved."

114.   Also on August 5, 2015, Resource Capital held an earnings conference call with analysts and investors to discuss the Company's second quarter 2015 earnings. During the call, several of the Individual Defendants addressed the Mezzanine Loan position and admitted that despite repeated previous omissions to the contrary, the Company had long been exposed to the risk of Puerto Rico's failing economy since 2007. More, the Individual Defendants admitted that despite repeated assurances that all of the Company's loans were performing; the Mezzanine Loan had not been performing since at least 2012. For example, defendant J. Cohen stated:

> [A] legacy mezzanine loan that *we purchased in 2007*, one of the last two mezzanine positions in our portfolio *deteriorated suddenly due to its exposure to Puerto Rico and we were forced to impair that asset*. We stopped investing in this type of loan in 2007 and the remaining mezzanine loan in our portfolio is a very good credit, a $7 million position secured by property in New York City and we expected to pay off within the next 18 months. This impairment causes our book value to decrease to $4.56 leaving us trading at approximately 78% of GAAP book value.
>
> *   *   *
>
> Obviously a large and very disappointing element of our result this quarter was the loan loss reserve that we recognize on our position in a mezzanine loan whose borrower is an affiliate of one of the world's largest private equity firm. The loan we impaired was one where we had a small percentage of a subordinated mezzanine position in a complicated multi-tranche $2.8 billion transaction that financed luxury hotels. *Our investment was purchased in 2007* had a very well capitalized and committed borrower went through several restructurings over the years to provide runway for the borrower to complete its business plan and we do expect it to be paid off when that happened, *but the last three assets are in Puerto Rico. The borrower's ability to favorably refinance its senior loans was impacted by economic and credit conditions in Puerto Rico,* and the new loan, which closed in May meaningfully reduced the borrower's time to achieve its plan. On such a highly-leveraged transaction, even small changes in value can have a large impact on the subordinated tranches, which unfortunately is where we were. Accordingly we are fully reserved for it.

115.   Later in the call, defendant Bloom further discussed the Puerto Rico Mezzanine Loan position and acknowledged that the position had not been performing and provided no monetary benefit to the Company since September 2012, stating:

> Jonathan addressed the specific reserve that we took this quarter on a mezzanine

loan that was part of a very large multi-tranche financing that included a $1.3 billion first mortgage and $625 million of mezzanine debt split into eight tranches, many with multiple participants, and over $830 million of borrower at equity into the transaction. It is important note that this loan dates back to mid- 2007 and *was restructured and amended in 2012. And since that time, interest was on an accrual basis, so it has not contributed to our income since September of 2012 in any meaningful way.* Pursuant to the terms of the extension the loan has not come due, nor is it in default.  That said, in the ordinary course of closing our quarters, we review all of our loan positions and *after our review of the subject transaction, the determination was made to impair the position in the current quarter, as we have serious doubts about the ultimate collectability of the loan upon maturity*. That said, markets can change suddenly and with almost a year until the loan matures, no one can be absolutely certain about the ultimate resolution of this impaired loan.

By way of brief history [Resource Capital's] commercial real estate business plan has always been to directly originate floating rate whole loans on likely transitional properties across the country. Having commenced operations in mid-2005, during the time that we were building out our national origination team, we still recognize relative value in certain mezzanine loan and B note investments. Markets were extremely liquid and the majority of these sub-debt positions paid off in relatively short order.  That said, we were always cognizant of the fact that multi-tranche debt transactions involved other lenders which result in a lack of unilateral control should a problem arise.

116.    During a follow-up question-and-answer session, defendants J. Cohen and Bloom recognized the previously undisclosed risk associated with the Mezzanine Loan given that it was secured by real estate located in Puerto Rico, a Commonwealth straddled with massive debt which suffered years of economic crisis.

[Analyst]:

I know this is a tough call for you guys, and I appreciate you stepping up addressing the stock situation right upfront for us. Thank you. I'd like to clarify for starters not that -- we'll come back to that large mezz loan, but at March, you were carrying $67.5 million of mezz loans with the $38 million impaired suggesting maybe $29 million, $30 million of other mezz loans. I wanted to compare that --you mentioned there was one remaining of $7 million in New York. Can you just clarify what is left in the mezz bucket beyond this hotel loan?

[Defendant Bloom]:

Steve, this is Dave, let me reconcile that for you. So you're right. It was $67 million less $38 million gets you to about $29 million.  Now $13 million paid off in Q2 on one position and another $9 million or $9.5 million paid off in July, right after the

quarter ended. So that's why we're now left with a little over $7 million from that one position.

[Analyst]:

…That's helpful, appreciate you clarifying that and the characteristics of the remaining $7 million.  And look, we recognize you guys have done an amazing job over last two, three years just shedding mezz where you could and just getting back to the large problematic loan. I guess it sounds like to me that it was a combination of both the structure, the original loan structure, and what became sort of an idiosyncratic situation with respect to what you ended up with is residual credit, and that's really the only question I have is you started off with 13 loans and *it sounds like you're ending up with three loans that are, happen to be in Puerto Rico, you use the term the last loans*. So help me understand as payoffs were made collateral was released; did you benefit from any of the pay down as these other 10 hotel properties were sold or did all that cash flow go to senior tranches. Let's start there?

[Defendant Bloom]:

…[T]o be clear, the priority of payment is sequential so the senior loan it was retired first and then tranches of mezzanine loan are retired in a specific order after that.

[Analyst]:

Yes, that's what was going through my mind. So, you end up going from,  it's almost like adverse selection. The most liquid properties I guess, go out first  and as a subordinate investor you're kind of left with, *you're really lending on the weaker loans in the pool, I guess, and you acknowledge that that was the weakness in that structure and one reason why you guys ceased doing that business*. Okay, so and just to be clear there is [sic] three hotels left and they're all in Puerto Rico. Correct?

[Defendant Bloom]:

There are now two…. They are all in Puerto Rico.

[Analyst]:

…So let me suggest this and maybe other analysts will have questions after this, but just a thought, this is very complicated. I think look, *there is a $0.31 hit to book* that's all fine, we know you're not in this business, I think investors will like to make their own decision about the possibility of any type of recovery, it can't hurt you any more now, right? But a thought I had is -- because it is so detailed and involved, I think people might want to know, how many room keys, what RevPAR, would you at least consider, and you don't have to answer this, but I'm  going to suggest that you consider putting in information piece together on the two loans or whatever you can disclose publicly and maybe put that out on an 8-K, and then sophisticated real estate investors can kind of draw their own conclusions as to

whether there is any possibility of a recovery or what would have to develop, so just a suggestion there if I may.

[Defendant J. Cohen]:

Thank you…. [W]e will take that under consideration.

[Analyst]:

You are very welcome. When you have these legacy situations … where you could end up in effect with a $40 million credit loss, is there any reach back on prior incentive fees that may have been paid, is there any adjustment to that for the benefit of stockholders, how would you and the Board address that if this becomes a real loss?

[Defendant J. Cohen]:

First of all we haven't -- unfortunately for us made very -- many incentive fees over the years. So I don't think there is many to reach back to, but obviously when it becomes real loss, it goes into that calculation.

117.   The above news devastated Resource Capital's market capitalization, which plunged 12.36% on August 5, 2015, erasing almost $58 million in market capitalization in a single day.  All told, Resource Capital's market capitalization tumbled 14.66% from August 4, 2015 to August 6, 2015, wiping out over $68.4 million in two days.

118.   On August 7, 2015, Resource Capital filed its quarterly report on Form 10-Q for the quarter ended June 30, 2015 (the "August 7, 2015 Form 10-Q").  The August 7, 2015 Form 10-Q finally acknowledged: (i) the Company's exposure to Puerto Rico's economy through its Mezzanine  Loan position, which dated back to 2007; and (ii) the extent of the credit risk to the Company's mezzanine loan portfolio.  More, the Company tacitly admitted that all of the Company's loans were in fact not "current" or "performing," as previously and repeatedly stated.  In particular, while previous disclosures affirmatively proclaimed that all of the Company's loans were "current" or "performing," the Company's disclosures now stated that "[t]he Company had no delinquent commercial  real estate loans."  Further, the Company admitted that a significant portion of its

mezzanine loans required the worst risk rating of four, rather than the lower risk ratings previously reported. Specifically, the August 7, 2015 Form 10-Q stated:

> During the quarter ended June 30, 2015, the Company recorded an allowance for *loan loss on a subordinated mezzanine loan position that was acquired in 2007*. The outstanding loan balance of $38.1 million was fully reserved and associated accrued interest of $3.0 million was reversed against interest income, for a total charge to operations of $41.1 million. The loan was originally supported by a portfolio of 13 hotel properties, most of which were luxury brand hotels. An impairment analysis showed that the fair value of the underlying collateral declined from that as of March 31, 2015. Contributing to this decline was a modification of the senior mortgage that accelerated the time horizon for disposing of the three remaining properties collateralizing the loan. *Compounding this fact, the remaining three luxury brand hotel properties securing the loan are located in or near San Juan, Puerto Rico, and recent economic and credit disruptions in Puerto Rico resulted in events that caused the Company to determine that realizable values had declined rapidly and that the troubled debt restructuring should be fully reserved as of June 30, 2015*.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of June 30, 2015** | | | | | | |
| Whole loans | $1,467,901 | $ 32,500 | $ — | $ 2,202 | $ — | $1,502,603 |
| B notes | 15,997 | — | — | — | — | 15,997 |
| Mezzanine loans | 16,750 | — | — | 38,072 | — | 54,822 |
| | $1,500,648 | $ 32,500 | $ — | $ 40,274 | $ — | $1,573,422 |
| | | | | | | |
| **As of December 31, 2014:** | | | | | | |
| Whole loans | $1,231,092 | $ 32,500 | $ — | $ — | $ — | $1,263,592 |
| B notes | 16,072 | — | — | — | — | 16,072 |
| Mezzanine loans | 45,432 | 21,934 | — | — | — | 67,366 |
| | $1,292,596 | $ 54,434 | $ — | $ — | $ — | $1,347,030 |

*The Company had no delinquent commercial real estate loans as of June 30, 2015 and December 31, 2014.*

119.     The August 7, 2015 Form 10-Q's Management Discussion and Analysis section also disclosed the effects of Resource Capital's allowance for loan loss associated with the Mezzanine Loan position and finally acknowledged the damaging effects of Puerto Rico's economy on its Mezzanine Loan investment. The August 7, 2015 Form 10-Q stated:

Although economic conditions in the United States have improved, previous conditions in real estate and credit markets continue to affect both us and a number of our commercial real estate borrowers. ***During the quarter ended June 30, 2015, the Company recorded a substantial allowance for loan loss on a subordinated mezzanine loan position that was acquired in 2007. The outstanding loan balance of $38.1 million was fully reserved, and associated accrued interest of $3.0 million was reversed against interest income for a total charge to operations of $41.1 million. The loan was originally supported by a portfolio of 13 hotel properties, most of which were luxury brand hotels. The last three luxury brand hotel properties securing the loan are located in or near San Juan, Puerto Rico, and recent economic and credit disruptions in Puerto Rico resulted in events that caused the Company to determine that the loan is impaired.*** In our bank and middle market loan portfolios, we recorded reserves of approximately $4.7 million for the six months ended June 30, 2015, which was primarily due to a significant increase in our middle market loan portfolio relating to a specific loan which had continued deterioration and defaulted in the second quarter of 2015. While we have recognized these losses in 2015, our credit quality on the balance of our loan portfolio is benign. In terms of delinquencies; only two bank loans, or $474,000, are delinquent out of a portfolio of $181.8 million; all but one, or $5.0 million, of our middle market loans are current out of a portfolio of $331.0 million; and none of our 87 CRE loans, totaling $1.6 billion, are delinquent.

120.    In addition, Resource Capital disclosed that the Company's allowance for loan loss had increased to $46.319 million as of June 30, 2015, compared to $7.385 million as of March 31, 2015 and $4.613 million as of December 31, 2014.

121.    On January 29, 2016, Resource America revealed that it hired an outside adviser to help its board consider its strategic and financial alternatives. The market in general understood that Resource America's announcement meant that it was looking to sell itself. By delaying the Company's increase in allowance for loan loss and delaying the acknowledgment of the devastating effects of Puerto Rico's economy on the Mezzanine Loan investment, Resource America would be able to present a longer period of high fees for the Resource Manager. On May 23, 2016, Resource America announced that C-III agreed to acquire it

## REASONS THE STATEMENTS WERE IMPROPER

122.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     Puerto Rico's economy has been in a recession since about 2006;

(b)     the Company's commercial real estate loan portfolio was in part exposed to Puerto Rico's ongoing economic decline since at least 2007 in connection with the Mezzanine Loan;

(c)     in August 2012, Moody's downgraded the asset pools in the 2007-WHALE8 Trust related to the Mezzanine Loan due to its very high credit risk;

(d)     during 2013, the Standard & Poor's Puerto Rico Municipal Bond index plummeted and never substantially recovered;

(e)     in October 2013, the Commonwealth of Massachusetts began investigating mutual funds with high levels of investment in Puerto Rico's bonds;

(f)     in February 2014, all three major credit ratings agencies downgraded Puerto Rico's bonds to junk;

(g)     in May 2014, Fitch Ratings rated the asset pools in the 2007-WHALE8 Trust related to the Mezzanine Loan position as exceptionally high credit risk;

(h)     by the first quarter of 2015, all of the properties securing the Mezzanine Loan were assets located within Puerto Rico; and

(i)     as a result of the foregoing, the Individual Defendants repeated representations and/or omissions concerning the Company's lack of exposure to Puerto Rico and the performance of the Company's loans were improper.

## DAMAGES TO RESOURCE CAPITAL

123.     As a result of the Individual Defendants' improprieties, Resource Capital disseminated improper, public statements concerning the extent of the commercial real estate loan portfolio's exposure to Puerto Rico's economy.   These improper statements have devastated Resource Capital's credibility as reflected by the Company's loss of over $68 million in market capitalization.   Further, the Individual Defendants caused or allowed Resource Capital to pay approximately $4.5 million in excessive compensation to the Resource Manager while the Company's equity was improperly inflated between the fourth quarter of 2012 and the first quarter of 2014, as demonstrated in the following table:

|  | Q4 2012 | FY 2013 | FY 2014 | Q1 2015 | Total |
|---|---|---|---|---|---|
| Reported Base Management Fee | $2,400,000 | $11,600,000 | $13,100,000 | $3,400,000 | $30,500,000 |
| Calculated Base Management Fee | $2,300,044 | $11,221,988 | $13,467,435 | $3,557,670 | $30,547,137 |
| Reduced Base Management Fee | $1,962,857 | $9,576,844 | $11,493,109 | $3,036,116 | $26,068,926 |
| Total Management Fee Overpaid | $337,187 | $1,645,143 | $1,974,326 | $521,554 | $4,478,210 |

124.     The Individual Defendants' unlawful course of conduct has also subjected the Company to potentially hundreds of millions of dollars in damages in connection with a number of lawsuits, including the Securities Class Action, which alleges that the Company and certain Individual Defendants violated securities laws by repeatedly misrepresenting that all of Resource Capital's loans were "performing" and/or "current."   On October 5, 2016, the Court for the Securities Class Action denied defendants motion to dismiss noting that: defendants statements "that the Mezzanine Loan [was] 'performing' or 'current' without stating the qualification that it was a non-interest-paying troubled debt of a borrower in financial difficulty was, in the words of SEC Rule 10b-5' … to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading….'"

125.     Resource Capital's performance issues and overpayment of management fees also damaged its reputation within the business community and in the capital markets.   In addition to

price, Resource Capital's current and potential investors consider a company's trustworthiness, stability, ability to accurately value its business prospects, and ability to keep costs reasonable and fair. Investors are less likely to invest in REITs that mismanage or otherwise squander investment money. Businesses are less likely to award contracts to companies that disseminate improper statements to their investors, fail to comply with their own internal protocols and external regulations, and are uncertain about their own financial conditions. Resource Capital's ability to raise equity capital or debt on favorable terms in the future is now impaired. The Company stands to incur higher marginal costs of capital and debt because the improper statements disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

126.     Further, as a direct and proximate result of the Individual Defendants' actions, Resource Capital has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement in the Securities Class Action for violations of federal securities laws;

(b)     costs incurred to investigate the wrongdoing; and

(c)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Resource Capital.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

127.     Plaintiff brings this action derivatively in the right and for the benefit of Resource Capital to redress injuries suffered, and to be suffered, by Resource Capital as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Resource Capital is named as a nominal

defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

128.    Plaintiff will adequately and fairly represent the interests of Resource Capital in enforcing and prosecuting its rights.

129.    Plaintiff was a stockholder of Resource Capital at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Resource Capital stockholder.

130.    The current Board of Resource Capital consists of the following nine individuals: defendants Kessler, Levin, Neff, Beach, Hart, Ickowicz, Fore, and Wiggins and non-defendant directors Andrew L. Farkas and Jeffrey P. Cohen.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because a Majority of the Board Are so Committed to the Decisions in Dispute that They Cannot Reasonably Be Expected to Respond to a Demand**

131.    The magnitude and duration of the Director Defendants' breaches of fiduciary duty alleged herein confirms their deep commitment to several disputed decisions, including the decisions: (i) to mislead investors concerning the Company's risks, financial exposure, and loan performance; (ii) to refuse to timely record an allowance for loan loss on the Mezzanine Loan; (iii) to continue to pay millions of dollars of excessive management fees to Resource Manager and Resource America that were based on inflated and inaccurate equities; and (iv) to issue misleading Proxy Statements to re-elect themselves to the Board and approve additional stock awards.

132.    As alleged above, for years defendants Kessler, Levin, Neff, Beach, Hart, Ickowicz, Fore, and Wiggins breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding the Company's exposure to Puerto Rico and the performance and risks of the Company's loan portfolio.  Each of these Director Defendants

signed one or more Form 10-Ks admitting that local geographical conditions could negatively impact the performance of the Company's investments, but utterly failing to disclose any information concerning the substantial and growing risk that Resource Capital had become subjected to in connection with the Company's investment in the Mezzanine Loan, or even that the Mezzanine Loan was significantly backed by properties located in Puerto Rico.  These Director Defendants further breached their duty of loyalty by causing or allowing the Company to repeatedly pay excessive management fees that were based on improperly inflated equity holdings to Resource Manager.

133.    Defendants Kessler, Levin, Neff, Beach, Hart, Ickowicz, Fore, and Wiggins also breached their duty of candor by negligently causing and/or permitting false and misleading statements in Resource Capital's 2014-2015 Proxy Statements.   The Proxy Statements misrepresented and failed to disclose: (i) the Board and the Audit Committee failed to provide adequate oversite to properly identify, assess, and manage risks, and also to control exposure to financial risks; (ii) the management fees paid to affiliates at the Resource Manager were inappropriate and were based on inflated and inaccurate equities; (iii) the known financial risks associated with the Mezzanine Loan; or (iv) the likelihood that the Company would need to record an allowance for loan loss on the Mezzanine Loan.

134.    Defendants Beach, Hart, Neff, and Wiggins, as members of the Audit Committee, reviewed and approved years' worth of improper statements and earnings guidance.  The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.  Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless

disregard, the Audit Committee Defendants caused these improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.

135.    Defendants Kessler, Levin, Neff, Beach, Hart, Ickowicz, Fore, and Wiggins also breached their duty of loyalty by failing to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures.  As a result of defendants Kessler, Levin, Neff, Beach, Hart, Ickowicz, Fore, and Wiggins' course of conduct, the Company is now the subject of the Securities Class Action.

136.    Plaintiff has not made any demand on the other stockholders of Resource Capital to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Resource Capital is a publicly held company with over thirty-one million shares outstanding and thousands of stockholders;

(b)    making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)    making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against Defendants J. Cohen, E. Cohen, Kessler, Levin, Neff, Beach, Hart, Ickowicz, Fore, and Wiggins for Violation of Section 14(a) of the Exchange Act**

137.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138.    The section 14(a) claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of defendants J. Cohen,

E. Cohen, Kessler, Levin, Neff, Beach, Hart, Ickowicz, Fore, and Wiggins.  The 14(a) claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

139.    Defendants J. Cohen, E. Cohen, Kessler, Levin, Neff, Beach, Hart, Ickowicz, Fore, and Wiggins negligently issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to stockholders that were contained in Resource Capital's 2014 Proxy and 2015 Proxy contained proposals to Resource Capital's stockholders that they vote to re-elect the members of the Board.  The 2014 Proxy and 2015 Proxy, however, misrepresented and failed to disclose: (i) the Board and the Audit Committee failed to provide adequate oversite to properly identify, assess, and manage risks, and also to control exposure to financial risks; (ii) the management fees paid to affiliates at the Resource Manager were inappropriate and were based on inflated and inaccurate equities; (iii) the known financial risks associated with the Mezzanine Loan; or (iv) the likelihood that the Company would need to record an allowance for loan loss on the Mezzanine Loan.

140.    In addition, the 2014 Proxy also sought stockholder approval of the Company's Omnibus Plan.  The 2016 Proxy Statement, however, falsely represented that additional director equity compensation would "attract, retain and motivate top quality employees, directors and other persons who provide services to [Resource Capital]" and, advance "the interests of [the Company] and stockholders," when, in fact, the directors' interests were aligned with American Capital, to which they were beholden for their current and prospective board and other corporate positions.

141.    By reasons of the conduct alleged herein, defendants J. Cohen, E. Cohen, Kessler, Levin, Neff, Beach, Hart, Ickowicz, Fore, and Wiggins violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Resource Capital misled

and/or deceived its stockholders by making false and misleading statements that were an essential link in stockholders heeding Resource Capital's recommendation to elect defendants J. Cohen, E. Cohen, Kessler, Levin, Neff, Beach, Hart, Ickowicz, Fore, and Wiggins and approve the Omnibus Plan.

142.     The false and misleading information contained in the 2014 Proxy and 2015 Proxy was material to Resource Capital's stockholders in determining whether or not to elect defendants J. Cohen, E. Cohen, Kessler, Levin, Neff, Beach, Hart, Ickowicz, Fore, and Wiggins.  This information was also material to the integrity of the directors that were proposed for election to the Board.  The proxy solicitation process in connection with 2014 Proxy and 2015 Proxy was an essential link in the election of nominees to the Board.

143.     The additional false and misleading information in the 2014 Proxy in connection with the Omnibus Plan was material to Resource Capital's stockholders in determining whether to approve the amendment.  The proxy solicitation process in connection with the 2014 Proxy was an essential link in the approval of the Omnibus Plan.

144.     Plaintiff, on behalf of Resource Capital, thereby seeks relief for damages inflicted upon the Company in connection with the improper election of defendants J. Cohen, E. Cohen, Kessler, Levin, Neff, Beach, Hart, Ickowicz, Fore, and Wiggins based upon the false and misleading 2014 Proxy and 2015 Proxy, and the approval of the Omnibus Plan.  Plaintiff, on behalf of Resource Capital, also seeks new director elections on the basis of a special proxy with appropriate corrective disclosures and disgorgement of compensation awarded under the Omnibus Plan.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

145.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

146.    The Individual Defendants owed and owe Resource Capital fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Resource Capital the highest obligation of good faith, fair dealing, loyalty, and due care.

147.    The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Resource Capital, and/or consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

148.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) the Puerto Rican economy has been in a recession since about 2006; (ii) the Company's commercial real estate loan portfolio was in part exposed to Puerto Rico's ongoing economic decline since at least 2007 in connection with the Mezzanine Loan; (iii) in August 2012, Moody's downgraded the asset pools in the 2007-WHALE8 Trust related to the Mezzanine Loan due to its very high credit risk; (iv) during 2013, the Standard & Poor's Puerto Rico Municipal Bond index plummeted and never substantially recovered; (v) in October 2013, the Commonwealth of Massachusetts began investigating mutual funds with high levels of investment in Puerto Rican bonds; (vi) in February 2014, all three major credit ratings agencies downgraded Puerto Rico's bonds to junk; (vii) in May 2014, Fitch Ratings rated the asset pools in the 2007-WHALE8 Trust related to the mezzanine

loan position as exceptionally high credit risk; (viii) by the first quarter of 2015, all of the properties securing the Mezzanine Loan were assets located within Puerto Rico; and (ix) as a result, Resource Capital's and/or the Individual Defendants' statements concerning the quality of the Company's loans and the nature of risk exposure were materially misleading and the management fees paid to Resource Manager were improperly inflated.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

149.    The Director Defendants, as directors of the Company, owed Resource Capital the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity, including by causing or allowing the Company and the Individual Defendants to repeatedly misrepresent Resource Capital's business and financial prospects as well as the quality of the Company's internal controls, and by repeatedly paying excessive fees that were based on improperly inflated equity holdings to Resource Manager.  The Director Defendants knew or were reckless in not knowing that: (i) the Puerto Rican economy has been in a recession since about 2006; (ii) the Company's commercial real estate loan portfolio was in part exposed to Puerto Rico's ongoing economic decline since at least 2007 in connection with the Mezzanine Loan; (iii) in August 2012, Moody's downgraded the asset pools in the 2007-WHALE8 Trust related to the Mezzanine Loan due to its very high credit risk; (iv) during 2013, the Standard & Poor's Puerto Rico Municipal Bond index plummeted and never substantially recovered; (v) in October 2013, the Commonwealth of Massachusetts began investigating mutual funds with high levels of investment in Puerto Rican bonds; (vi) in February 2014, all three major credit ratings agencies downgraded Puerto Rico's bonds to junk; (vii) in May 2014, Fitch Ratings rated the asset pools in the 2007-WHALE8 Trust related to the mezzanine loan position as exceptionally high credit risk; (viii) by the first quarter of 2015, all of the properties securing the Mezzanine Loan were assets located within Puerto Rico; and (ix) as a result, Resource Capital's and/or the

Individual Defendants' statements concerning the quality of the Company's loans and the nature of risk exposure were materially misleading and the management fees paid to Resource Manager were improperly inflated. The Director Defendants also breached their duties of candor and loyalty by causing and/or permitting Resource Capital to issue the 2014-2015 Proxy Statements, which misrepresented and omitted material information concerning the Board's performance and the waste of corporate assets created and perpetuated thereby. Accordingly, the Director Defendants breached their duty of loyalty to the Company.

150.    The Audit Committee Defendants, Beach, Hart, Neff, and Wiggins, breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

151.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Resource Capital has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

152.    Plaintiff, on behalf of Resource Capital, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

153.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

154.    As a result of the misconduct described above, the Individual Defendants have caused Resource Capital to waste its assets by paying millions of dollars in unfair fees to the Resource Manager for years and by expending valuable resources in defending itself in the

Securities Class Actions that the Individual Defendants brought on with their improper statements. In addition, the Individual Defendants have caused Resource Capital to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

155.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

156.    Plaintiff, on behalf of Resource Capital, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants, Defendant Resource America, and Defendant Resource Manager for Unjust Enrichment

157.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

158.    By their wrongful acts and omissions, the Individual Defendants, defendant Resource America, and defendants Resource Manager were unjustly enriched at the expense of and to the detriment of Resource Capital.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Resource Capital.  Defendants Resource America and Resource Manager were unjustly enriched as a result of the millions of dollars in excessive management fees paid by Resource Capital.

159.    Plaintiff, as a stockholder and representative of Resource Capital, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

160.    Plaintiff, on behalf of Resource Capital, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Resource Capital, demands judgment as follows:

A.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing Resource Capital to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Resource Capital and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.      a proposal to strengthen the Company's controls over dealings with related parties;

2.      a proposal to strengthen the Company's controls over management fees;

3.      a proposal to strengthen the Company's controls over financial reporting;

4.      a proposal to strengthen Resource Capital's oversight of its disclosure procedures;

5.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

6.      a provision to permit the stockholders of Resource Capital to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a

constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Resource Capital has an effective remedy;

D.     Awarding to Resource Capital restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: January 11, 2017

LAW OFFICES OF THOMAS G. AMON

/s/ Thomas G. Amon

THOMAS G. AMON

733 3rd Avenue, 15th Floor
New York, NY 10017
Telephone: (212) 810-2430
E-mail: tamon@amonlaw.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
SHANE P. SANDERS
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
       csmith@robbinsarroyo.com
       ssanders@robbinsarroyo.com

Attorneys for Plaintiff

1143577

## VERIFICATION

I, Joseph Greenberg, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _____1/6/17_____

_____
JOSEPH GREENBERG